RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0322p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BELLSOUTH TELECOMMUNICATIONS, INC.,
　　　　　　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

SOUTHEAST TELEPHONE, INC. and PUBLIC SERVICE
COMMISSION OF KENTUCKY,
　　　　　　　　　　　*Defendants-Appellees.*

No. 05-6657

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 04-00084—Joseph M. Hood, Chief District Judge.

Argued: July 19, 2006

Decided and Filed: August 28, 2006

Before: GILMAN and SUTTON, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Sean A. Lev, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, Washington, D.C., for Appellant. Jonathon Nicholas Amlung, Louisville, Kentucky, Amy E. Dougherty, KENTUCKY PUBLIC SERVICE COMMISSION, Frankfort, Kentucky, for Appellees. **ON BRIEF:** Mark R. Overstreet, STITES & HARBISON, Frankfort, Kentucky, Dorothy J. Chambers, BELLSOUTH TELECOMMUNICATIONS, INC., Louisville, Kentucky, for Appellant. Amy E. Dougherty, John E.B. Pinney, KENTUCKY PUBLIC SERVICE COMMISSION, Frankfort, Kentucky, Christopher T. Handman, David L. Sieradzki, Martin A. Price, HOGAN & HARTSON, Washington, D.C., for Appellees.

_____

## OPINION

_____

　　　RONALD LEE GILMAN, Circuit Judge. The principal question in this appeal is whether the Public Service Commission of Kentucky (the PSC) correctly applied a superseded Federal Communications Commission (FCC) regulation on the ground that application of the current regulation to a pending case would be impermissibly retroactive. This issue arises in the context of

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

Southeast Telephone, Inc.'s attempt to modify the terms of its contract with BellSouth Telecommunications, Inc. Underlying the dispute is a complex statutory and regulatory scheme, as well as important principles of retroactivity analysis. The district court agreed that applying the current FCC rule would be impermissibly retroactive, and thus upheld the administrative ruling. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to vacate the order of the PSC.

# I. BACKGROUND

## A.        Statutory and regulatory background

In passing the Telecommunications Act of 1996 (Act), 47 U.S.C. § 251 et seq., Congress sought to "end[] the longstanding regime of state-sanctioned monopolies" in the local telephone markets. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). To that end, the Act imposes on *incumbent* local exchange carriers (ILECs) the obligation to share their existing networks with new entrants to the market, who are referred to as *competing* local exchange carriers, or CLECs. *See id.*; 47 U.S.C. § 251(c). The Act, as this court has explained,

> specifies three methods of competition: 1) the ILEC must provide to a CLEC that has or builds its own local telephone network, interconnection with the ILEC's network; 2) the ILEC must provide access to its own "network elements" on an "unbundled" basis to a CLEC wishing to acquire a network by leasing all or part of the ILEC's network, and 3) the ILEC must sell its retail services at wholesale prices to a CLEC planning simply to resell the incumbent's services at retail prices.

*Michigan Bell Tele. Co. v. Strand*, 305 F.3d 580, 582 (6th Cir. 2003) (citations omitted).

One of the key obligations imposed by the Act is the requirement that ILECs make "interconnection" and "network elements" services available to a CLEC that requests those services. *See id.*; 47 U.S.C. § 252(c)(2). Interconnection is the actual physical "linking of two networks for the mutual exchange of traffic." 47 C.F.R. § 51.5. Network elements, as the name indicates, are individual components of the ILEC's existing network, "including but not limited to, subscriber numbers, databases, signaling systems, and information sufficient for billing and collection." *Id.* These services must be provided "on rates, terms and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(2)(D).

ILECs are not, however, required to provide these services to CLECs free of charge. Instead, the Act includes "specified procedures for forming 'interconnection agreements,' the Congressionally prescribed vehicle for implementing the substantive rights and obligations set forth in the Act." *Strand*, 305 F.3d at 582. Parties may reach these agreements through direct negotiation or arbitration, although the agreements remain subject to the approval of the relevant state's regulatory commission. If the agreement is a negotiated one, the state commission may reject it only by finding (1) that the agreement discriminates against a carrier not a party to the agreement, or (2) that the agreement "is not consistent with the public interest, convenience, and necessity." 47 U.S.C. § 252(e)(2)(A). State commissions may reject arbitrated agreements that fail to comply with the statutory requirements, including the pricing standards set forth in § 252(d) of the Act.

An additional duty imposed on ILECs is at the heart of this case. Section 252(i) of the Act requires ILECs to "make available any interconnection, service, or network element provided under an agreement . . . to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." This section effectively allows a CLEC to "opt in" to the terms of an agreement that an ILEC has previously entered into with another

carrier and that a state commission has already approved. *See BellSouth Telecomm., Inc. v. Universal Telecom, Inc.*, - - F.3d - - , 2006 WL 2032866, at *1 (6th Cir. July 21, 2006) (explaining that § 252(i) "permits an entrant to a local telephone market . . . to forgo negotiation or arbitration with an incumbent (like BellSouth) by adopting a previously negotiated or arbitrated interconnection agreement between the incumbent and another carrier"). What the statute does not specify, however, is whether a CLEC that chooses to opt in can do so on a service-by-service (or term-by-term) basis or must instead agree to be bound by the entirety of the existing interconnection agreement.

The FCC initially resolved this ambiguity in favor of the former interpretation when it promulgated what came to be known as the "pick-and-choose rule." *See* First Report and Order, *Implementation of Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd. 15499, 16139 ¶ 1314 (1996) ("First Report and Order"). This rule permitted CLECs "to obtain access under section 252(i) to any *individual* interconnection, service, or network element arrangement on the same terms and conditions as those contained in any agreement approved under section 252," *id.* (emphasis added), and also instructed state commissions to adjudicate opt-in requests on "an expedited basis." *Id.* at 16141 ¶ 1321. The final version of the rule, which was codified at 47 C.F.R. § 51.809 (1997), highlighted the importance of expeditiously processing claims by requiring ILECs to make the covered services and facilities available to CLECs "without unreasonable delay." *Id.* § 51.809(a).

At the same time, the final rule explicitly permitted ILECs to raise specified challenges before the state commission regarding a CLEC's attempt to opt in to the terms of an existing agreement. Three limitations on a CLEC's power to opt in were included in the final rule, and a fourth was set forth in the First Report and Order. First, an individual agreement was available for opting in only "for a reasonable period of time after the approved agreement is available for public inspection under [the Act]." *Id.* § 51.809(c); *see BellSouth Telecomm., Inc.*, - - F.3d - -, 2006 WL 2032866, at *1 (recognizing that "[t]he right to adopt an existing interconnection agreement contains several limitations, one of which is time").

The final rule also permitted ILECs to interpose a challenge to the requested opt in on one of two other grounds: (1) that "[t]he costs of providing a particular interconnection, service, or element to the requesting [CLEC] are greater than the costs of providing it to the telecommunications carrier that originally negotiated the agreement," or (2) that "[t]he provision of a particular interconnection, service, or element to the requesting carrier is not technically feasible." 47 C.F.R. § 51.809(b) (1997); *see also Global NAPs, Inc. v. Verizon New England, Inc.*, 396 F.3d 16, 26 (1st Cir. 2005) (describing these three "limitations to a CLEC's opt in rights under § 252(i)"). Finally, the FCC explained in its First Report and Order that ILECs could "require a third party [to] agree to certain terms and conditions" beyond the requested service so long as the ILEC proved "to the state commission that the terms and conditions were legitimately related to the purchase of the individual element being sought." 11 FCC Rcd. at 16139 ¶ 1315.

ILECs across the country challenged the validity of the pick-and-choose rule, eventually convincing the Eighth Circuit to strike it down. *See Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 801 (8th Cir. 1997). But the Supreme Court reversed the Eighth Circuit, holding that "[t]he FCC's interpretation is not only reasonable, it is the most readily apparent." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 396 (1999). The Court rejected the ILECs' contention, endorsed by the Eighth Circuit, that the rule unreasonably "threaten[ed] the give-and-take of negotiations" because ILECs would not make concessions in any agreement out of fear that all other market entrants could benefit from the same concession. *Id.* at 395. In so ruling, however, the Court emphasized both the protections afforded ILECs by the rule itself and by the FCC's statement that an ILEC "can require a requesting carrier to accept all terms that it can prove are 'legitimately related' to the desired term." *Id.* at 396 (citing the First Report and Order). The Court concluded that the ultimate question

of whether the rule would positively or negatively affect negotiations was "a matter eminently within the expertise of the Commission and eminently beyond our ken." *Id.*

Based upon the cumulative experience of the ILECs under the Act, the FCC decided to change course in August of 2003. It issued a Notice of Proposed Rulemaking (NPRM) in which it "tentatively concluded" that the pick-and-choose rule "discourages give-and-take bargaining." Second Report and Order, *Review of the Section 251 Unbundling Obligations of Local Exchange Carriers*, 19 FCC Rcd. 13494, 13496 ¶3 (2004) (recounting the conclusions announced in the NPRM). The FCC then proposed replacing that rule with a new one under which, if an ILEC "files for and obtains state approval for a statement of generally available terms (SGAT), the current pick-and-choose rule would apply only to that SGAT, and all other interconnection agreements would be subject to an all-or-nothing rule." *Id.* at 13497 ¶ 5. After further study, the FCC jettisoned this proposal and instead promulgated a new rule that was "all or nothing" across the board. In other words, if a CLEC wants to adopt a term or service of an existing agreement, it must opt in to the entire agreement. *See id.* at 13494 ¶ 1.

The FCC intended for the new rule to go into effect immediately. Specifically, the FCC declared that, "in order to allow this regime to have the broadest possible ability to facilitate compromise, the new all-or-nothing rule will apply to all effective interconnection agreements, including those approved and in effect before the date the new rule goes into effect." *Id.* at 13501 ¶ 10. "As of the effective date of the new rule," therefore, "the pick-and-choose rule will no longer apply to any interconnection agreement." *Id.* Under the all-or-nothing rule, ILECs are required to "make available without unreasonable delay to any requesting [CLEC] any agreement *in its entirety* to which the [ILEC] is a party that is approved by a state commission . . . upon the same rates, terms, and conditions as those provided in the agreement." 47 C.F.R. § 51.809(a) (2004) (emphasis added). The rule became effective on August 23, 2004, one month after its publication in the Federal Register. *See* Final Rule, *Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 69 Fed. Reg. 43762 (July 22, 2004).

## B.      Factual and procedural background

BellSouth entered into an interconnection agreement with Southeast in October of 2001. The agreement contained two clauses relevant to the present controversy. First, paragraph 12 of the agreement governed the resolution of disputes between the parties. That paragraph provided:

> Except as otherwise stated in this Agreement, if any dispute arises as to the interpretation of any provision of this Agreement or as to the proper implementation of this Agreement, the aggrieved Party shall petition the [PSC] for a resolution of the dispute. However, each Party reserves any rights it may have to seek judicial review of any ruling made by the [PSC] concerning this Agreement.

Another provision, paragraph 15, tracked the language of 47 U.S.C. § 252(i), allowing Southeast to opt in to "any interconnection, service, or network element" provided under the existing agreement, but also requiring Southeast to adopt "all rates, terms, and conditions . . . legitimately related to" the other terms that it chose. The PSC approved BellSouth's agreement with Southeast in November of 2001.

Over a year later, BellSouth entered into a separate arbitrated agreement with Cinergy Communications Company, another CLEC. The dispute-resolution provision of the agreement with Cinergy differed in two notable ways from the one signed by Southeast. First, the provision permitted the parties to "avail themselves of any available legal remedies in the appropriate forum" with respect to all "issues over which the [PSC] does not have authority[.]" Second, the Cinergy

agreement required the parties "to carry on their respective obligations under [the] Agreement while any dispute resolution is pending." The purpose of this latter clause was to ensure that Cinergy retained access to BellSouth's facilities and services—and would thus continue to be able to serve its customers—notwithstanding any legal battles with BellSouth.

On June 8, 2004, Southeast filed with the Kentucky PSC a "Notice of Intent to Adopt Certain Provisions" of BellSouth's agreement with Cinergy. The only provision that Southeast sought to adopt was the one governing "Resolution of Disputes." Southeast expressed in the Notice its intent "to be bound by the terms of numerical paragraphs 11 and subsection 11.1 of the [Cinergy] agreement." Those terms would replace the ones contained in paragraph 12 of Southeast's agreement with BellSouth. Insisting that its request should "be reviewed expeditiously and promptly granted," Southeast asked the PSC to "[a]pprov[e] the request and mak[e] the amendment to the interconnection agreement effective as of the date of the Order."

BellSouth opposed Southeast's request and filed a formal objection with the PSC on June 22, 2004. In its filing, BellSouth argued that Southeast was not entitled to adopt the dispute-resolution provision for two reasons. The first was that the plain language of both 47 U.S.C. § 252(i) and the pick-and-choose rule in effect at the time required ILECs to "make available" to CLECs only "interconnection[s], service[s] or network element[s]." BellSouth argued that the dispute-resolution provision did not fall under any of these categories, so that Southeast was not entitled to opt in to it. Second, BellSouth read its agreement with Southeast as obliging Southeast to submit any proposed modifications to BellSouth before invoking the authority of the PSC.

The PSC issued its order on September 29, 2004. By that time, the all-or-nothing rule, which had been published in the Federal Register as having an effective date of August 23, 2004, had already supplanted the pick-and-choose rule. Under the new rule, as the PSC acknowledged, Southeast's request would have to be rejected. The PSC nevertheless concluded, in a one-sentence analysis, that "Southeast's adoption notice should be reviewed under the law as it existed when the notice was filed." According to the PSC, the dispute-resolution procedures sought by Southeast "are an integral term and condition of a contract and directly relate to the provision of interconnection, service, or network elements." Southeast's request to adopt the dispute-resolution provision from the Cinergy agreement was therefore granted.

BellSouth requested a rehearing, which the PSC denied. The PSC's denial order was accompanied by an explanation of its decision to apply the FCC rule in effect at the time of Southeast's request. Under the PSC's "longstanding practice," the explanation read, Southeast's request would have been "granted by Order within a few days of receipt . . . but for BellSouth's objections." In other words, Southeast's request would have allegedly been granted before the pick-and-choose rule took effect had BellSouth not filed objections. The PSC was concerned that applying the new rule to the pending request would give ILECs an incentive "to delay proceedings when matters are pending" in order to invoke beneficial changes in the law. Because the PSC "would ordinarily have entered its Order" approximately one month prior to the effective date of the new rule, the PSC decided that applying the new rule to Southeast's adoption request would have been "unjust."

BellSouth challenged the decision of the PSC in the district court, arguing that (1) the PSC erred in refusing to apply the all-or-nothing rule to Southeast's pending adoption request, and (2) under the plain language of the statute and the pick-and-choose rule, Southeast was not entitled to adopt the dispute-resolution provision because that provision was not an "interconnection, service, or network element arrangement." The district court rejected both of these arguments and upheld the PSC's decision.

As to BellSouth's first challenge, the district court applied the framework set forth by the Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994) (establishing a three-step analysis for determining whether an intervening change in the law can be properly applied to a pending case). The court first concluded that the FCC had not expressly defined the temporal reach of the new rule. At the second step of the *Landgraf* analysis, the district court reasoned that the mandatory language in 47 U.S.C. § 252(i) granted Southeast a vested right to adopt terms contained in other BellSouth agreements while the pick-and-choose rule was still in effect. That vested right would be impaired, the court reasoned, by application of the all-or-nothing rule. The court thus held that applying the new rule would be impermissibly retroactive and that, because Congress had not explicitly endorsed such a result, the presumption against retroactivity controlled.

With respect to BellSouth's second challenge, the district court read the statute and regulation as allowing CLECs to opt into all "terms and conditions" of existing agreements, and ruled that dispute-resolution provisions are an integral term and condition of the agreements under which ILECs provide services. Finally, the court rejected BellSouth's contention that the dispute-resolution provision was "legitimately related" to other terms of the Cinergy agreement and that Southeast could adopt that provision only by adopting these other terms. This timely appeal followed.

## II. ANALYSIS

### A.     Standard of review

We review the ruling of a state administrative body under two separate standards. Questions of law, in particular a state commission's interpretation of the Act, are reviewed de novo. *See Michigan Bell Tele. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 354 (6th Cir. 2003) ("We review the Commission's interpretation of the Act de novo . . . , according little deference"). On the other hand, a state commission's "findings of fact made in the course of exercising its enforcement authority" are reviewed under "the 'arbitrary and capricious' standard." *Michigan Bell Tele. Co. v. Strand*, 305 F.3d 580, 586 (6th Cir. 2003). The question presented by this case—whether applying the all-or-nothing rule to Southeast's pending application would have had an impermissible retroactive effect—is a purely legal one that we will review de novo. *See MCIMetro Access*, 323 F.3d at 354.

### B.     The district court erred in concluding that application of the all-or-nothing rule to Southeast's request would have had an impermissible retroactive effect

The Supreme Court has struggled in recent years to resolve the "apparent tension" between "two seemingly contradictory statements found in [its] decisions concerning the effect of intervening changes in the law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 263-64 (1994). As a general rule, a court must "apply the law in effect at the time it renders its decision." *Id.* at 264 (quoting *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711 (1974)) (quotation marks omitted). Because "[r]etroactivity is not favored in the law," however, courts should not construe "congressional enactments and administrative rules . . . to have retroactive effect unless their language requires this result." *Id.* (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)) (quotation marks omitted). In other words, courts should apply the law in effect at the time that they decide a case *unless* that law would have an impermissible retroactive effect as that concept is defined by the Supreme Court. *See Patel v. Gonzales*, 432 F.3d 685, 691 (6th Cir. 2005) ("Courts should apply the law in effect at the time of the decision, unless such law has a retroactive effect on the parties.").

The difficult issue in these cases is deciding under what circumstances a statute or regulation operates retroactively. Answering this question, as the Supreme Court has noted, "is not always a

simple or mechanical task." *Landgraf*, 511 U.S. at 268.  For one thing, "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Id.* at 269 (citation omitted).  Courts must accordingly "ask whether the new provision attaches new legal consequences to events completed before its enactment," *id.* at 269-70, such as by "impair[ing] rights a party possessed when he acted, increas[ing] a party's liability for past conduct, or impos[ing] new duties with respect to transactions already completed." *Id.* at 280.  In making this determination, courts take "sound guidance" from "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* at 270.

The Supreme Court recently confirmed the "sequence of analysis" to be employed "when an objection is made to applying a particular statute said to affect a vested right or to impose some burden on the basis of an act or event preceding the statute's enactment." *Fernandez-Vargas v. Gonzales*, 548 U.S. ___, 126 S. Ct. 2422, 2428 (2006).  A reviewing court must first examine

> whether Congress has expressly prescribed the statute's proper reach, and in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying our normal rules of construction.  If that effort fails, we ask whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the basis of conduct arising before its enactment.  If the answer is yes, we then apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question owing to the absence of a clear indication from Congress that it intended such a result.

*Id.* (citations, quotation marks, and alterations omitted).

The district court in the present case concluded, and none of the parties dispute, that the FCC's all-or-nothing rule does not set forth its "temporal reach," and that neither Congress nor the FCC has addressed the application of the new regulation to pending cases.  Under the framework set forth above, therefore, the dispositive question before us is "whether applying the [all-or-nothing rule] to [Southeast's request] would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the basis of conduct arising before its enactment." *See id.* (citation, quotation marks, and alterations omitted).

### 1.       *Applying the "all-or-nothing rule" to Southeast's request would not be impermissibly retroactive*

At the heart of the dispute lies Southeast's contention, accepted by the district court, that Southeast acquired a vested right to adopt the dispute-resolution provision in question upon filing its notice of intent with the PSC.  Southeast's principal argument, therefore, is that applying the later-promulgated all-or-nothing rule to its adoption request would "impair a vested right" and be impermissibly retroactive under *Landgraf*. *See* 511 U.S. at 269 (endorsing Justice Story's statement that a statute that "takes away or impairs vested rights acquired under existing laws . . . must be deemed retrospective").  We agree with BellSouth, however, that a proper understanding of the statutory framework demonstrates that Southeast acquired no vested rights upon the filing of its adoption request.

Neither § 252(i) of the Act nor the FCC regulations interpreting it create an unconditional opt-in right or "guarantee" that a CLEC's adoption request will be granted.  To the contrary, both the pick-and-choose rule and the current all-or-nothing rule contemplate a regime under which ILECs retain the ability to challenge opt-in requests. The pick-and-choose rule, as explained in Part I.A. above, permitted ILECs to oppose an adoption request on the bases of comparable cost and

technical feasibility, and also on the ground that the CLEC waited too long after the publication of the original agreement to invoke its opt-in right. 47 C.F.R. § 51.809 (1997); *see also BellSouth Telecomm., Inc. v. Universal Telecom, Inc.*, - - F.3d - - , 2006 WL 2032866, at *5 (6th Cir. July 21, 2006) (explaining that "the regulation by its terms links the reasonableness of an adoption to the passage of time").

In addition to the above three grounds, the First Report and Order included a fourth limitation on the opt-in right, allowing ILECs to "require a requesting carrier to accept all terms that it can prove are 'legitimately related' to the desired term." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 396 (1999) (quoting the First Report and Order). These grounds for challenging a CLEC's entitlement to opt in to an existing agreement would be meaningless if, as Southeast and the PSC maintain, Southeast's adoption request became effective (and binding) at the moment that the request was filed.

A recent decision by the First Circuit also refutes Southeast's contention that the opt-in right conferred by the Act and the regulation was unconditional and automatic. *See Global NAPs, Inc. v. Verizon New England, Inc.*, 396 F.3d 16 (1st Cir. 2005). In that case, the CLEC (Global NAPs) entered into unsuccessful negotiations with the ILEC (Verizon New England). The parties eventually asked that the disputed aspects of their negotiation be arbitrated by the Massachusetts state commission, which resolved the open issues and ordered the parties to incorporate the terms into their agreement by a certain date. *Id.* at 19-20. Before that deadline passed, however, Global NAPs refused to accede to the arbitrated agreement and instead sought to opt in to an existing agreement between Verizon and Sprint. *Id.* at 20. The state commission denied Global NAPs's opt-in request and ordered it to comply with the commission's previous ruling. *Id.* at 20-21. Both the district court and the First Circuit affirmed.

In a section of its analysis especially pertinent to the present case, the First Circuit rejected Global NAPs's contention that "§ 252(i) gives it an unconditional right to . . . opt into a previously available agreement." *Id.* at 24. Reading that section "in light of the structure and intent of the statute," the First Circuit concluded that § 252(i) "is written in terms of an obligation on the part of ILECs to make agreements available to potential CLECs, *not* as an unconditional right." *Id.* at 24-25 (emphasis added). The court then interpreted the FCC regulations—and the pick-and-choose rule in particular—as supporting the same conclusion. It reasoned as follows:

> The FCC regulation 47 C.F.R. § 51.809 itself rejects Global NAPs' premise that § 252(i) grants an unconditional right to CLECs to adopt the terms of any interconnection agreement the ILEC has with another CLEC. The obligation of ILECs to make those agreements available to other CLECs is itself subject to conditions: comparable-cost, technical-feasibility, and the reasonable-time restrictions are three such conditions contemplated by the regulation.

*Id.* at 26.

The First Circuit's analysis elucidates two propositions crucial in the context of the present case. First, § 252(i) speaks in terms of an ILEC's obligations, not in terms of a CLEC's rights. The second and related proposition is that, because the obligations of the ILEC are not absolute, any concomitant rights conferred upon CLECs are similarly limited and therefore conditional.

If a CLEC's opt-in rights are "conditional," upon what are they conditioned? The answer, simply stated, is that the right to adopt the provision of an existing agreement is contingent upon a state commission's determination that such an adoption is proper under the statute and the governing regulation. Southeast appears to concede this point in part, admitting that "the Kentucky PSC had

to formally approve the revision to the interconnection agreement, and BellSouth had the option to propose to incorporate additional terms and conditions in connection with the provision that Southeast specified for 'opt in.'"  In the next breath, however, Southeast insists that its "vested 'opt in' right was not contingent upon the PSC's process for approving the revised agreement" because such a result would contravene the FCC's statement that CLECs need not "undergo a lengthy negotiation and approval process . . . before being able to utilize the terms of a previously approved agreement."  *See* First Report and Order, 11 FCC Rcd. at 16141 ¶ 1321.

But Southeast cannot have it both ways—opting in to the existing agreement either was or was not "an already-completed event" at the moment that the request was filed.  Southeast's acknowledgment that its attempt to revise the agreement did not become final until the PSC approved its request contradicts its argument that the PSC's approval process "amounted to a recognition of an already-completed event."  If, as Southeast appears to concede, the opt-in request did not become final until approval by the PSC, then the event simply was not completed at the time of filing.  This conclusion is confirmed by the language that Southeast itself used in the adoption request, where it asked the PSC to "[a]pprov[e] the request and mak[e] the amendment to the interconnection agreement *effective as of the date of the Order*."  (Emphasis added.)  Again, if the opt in was truly finalized at the time the request was filed, one would expect Southeast to have sought a *nunc pro tunc* order in which the PSC formally approved the adoption and made it effective as of the date of the initial request.  But Southeast sought nothing of the kind.

A hypothetical example might help to illuminate the problematic nature of Southeast's position.  Assume that the dispute-resolution provision in the original agreement called for the parties to submit *all* disputes to the PSC.  The provision in the Cinergy agreement, in contrast, allows the parties to take disputes falling outside the PSC's jurisdiction directly to court.  Southeast proceeds to file its adoption request on June 8, 2004, with the expectation that the PSC will act on that request in a matter of weeks.  Assume now that a major dispute outside of the PSC's jurisdiction arises between Southeast and BellSouth on June 10, 2004, well before the PSC is expected to act.  Could Southeast immediately invoke the new dispute-resolution provision that it has sought to adopt and thus file suit against BellSouth directly in court, rather than file a grievance with the PSC?  We believe that the proper answer is clearly "no," because Southeast cannot invoke a provision that has not yet been declared part of the contract between the parties.

This hypothetical illustrates a point convincingly pressed by BellSouth in its briefs:  that filing an application with an agency does not generally confer upon the applicant an inviolable right to have the agency rule on the application pursuant to the regulations in effect at the time of filing.  *See Pine Tree Med. Assocs. v. Sec. of Health and Human Servs.*, 127 F.3d 118, 121 (1st Cir. 1997) (agreeing with the district court's ruling that "the mere filing of an application is not the kind of completed transaction in which a party could fairly expect stability of the relevant laws as of the transaction date").  In *Pine Tree Medical Associates*, the plaintiff, a provider of healthcare services, requested that a government agency designate a particular town as a "medically underserved population," or MUP.  *Id.* at 120.  Healthcare providers that serve MUPs may be eligible "for substantial, cost-based reimbursement under Medicare and Medicare programs."  *Id.*  The agency altered the guidelines used to make the MUP determination after the provider had submitted an application but before the agency had ruled.  Using the stricter guidelines for evaluating the provider's request, the agency then denied the application.  *Id.*  The First Circuit found no retroactivity problem with the use of the new guidelines, squarely rejecting "the proposition that filing an application with an agency essentially fixes an entitlement to the application of those *substantive* regulations in force on the filing date."  *Id.* at 122 (emphasis in original).

We agree with BellSouth that the district court's attempt to distinguish *Pine Tree Medical Associates* is unconvincing.  The district court reasoned that the healthcare provider had sought "a

prospective benefit," whereas Southeast "notif[ied] an agency of a preexisting right to adopt." We have two responses to this line of reasoning. The first is that the distinction strikes us as one without a difference. Just as the healthcare provider in *Pine Tree Medical Associates* claimed that it was entitled to a statutory benefit under the regulations in effect at the time, Southeast argues that it was entitled to the statutory opt-in benefit under an FCC regulation that was in effect at the time of its application but repealed by the time that its request was decided. Procedurally, therefore, the present case is on all fours with *Pine Tree Medical Associates*.

Second, the relief sought by Southeast, although not a governmental "benefit," nevertheless tilts toward being "prospective" in nature. Because the new dispute-resolution provision would take effect as of the date of the PSC's order, that provision would govern only the future relations between the parties. Applying new statutes (or regulations) that "authorize[] or affect[] the propriety of prospective relief," the Supreme Court has said, does not raise retroactivity concerns. *Landgraf*, 511 U.S. at 273. The Court in *Landgraf* gave as an example of such a statute one that "governed the propriety of injunctive relief against labor picketing." *Id.* While the effect that a newly enacted regulation has on how parties' future disputes will be resolved is not directly analogous to the Court's injunction example, the fact that applying the all-or-nothing rule would deprive Southeast of only a future contractual benefit serves to distinguish the present case from the "quintessentially backward looking" damages provisions held to be impermissibly retroactive in *Landgraf*. *Id.* at 282.

One other aspect of *Landgraf* is particularly instructive in the present context. The Supreme Court in that case emphasized that "[a] statute does not operate 'retrospectively' merely because it . . . upsets expectations based in prior law." *Id.* at 269 (emphasis added). At the end of that sentence, the Court added an explanatory footnote elaborating on why a statute's potential to upset expectations that a party had formed based upon the prior state of the law was not enough, in and of itself, to make application of that statute impermissibly retroactive:

> Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards. See [L. Fuller, The Morality of Law 60 (1964)] ("If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever"). Moreover, a statute is not made retroactive merely because it draws upon antecedent facts for its operation.

*Id.* at 269 n.24 (citations and quotation marks omitted). In other words, the fact that parties engage in conduct on the assumption that the law will allow them to act or to benefit in a certain manner is not a sufficient reason to refuse to apply a new law that renders that assumption misplaced.

One of the cases cited by BellSouth drives this point home. In *Southwest Center for Biological Diversity v. U.S. Department of Agriculture*, 314 F.3d 1060, 1061 (9th Cir. 2002), an environmental group filed a Freedom of Information Act (FOIA) request seeking information about a rare bird that it believed qualified as an endangered species. The U.S. Forest Service refused to disclose the information, and the group filed suit. While the case was pending in the district court, Congress passed a new statute exempting the type of information sought by the group from FOIA. *Id.* The district court applied the new exemption and denied the group's FOIA request.

On appeal, the Ninth Circuit affirmed, rejecting the environmental group's argument that applying the new statute was impermissibly retroactive because the group "had a right to the information when it filed its suit (or when it made its earlier request) and it loses that right by

application of the new exemption." *Id.* at 1062. The court reasoned that the group's filing a FOIA request was not the type of "action in reliance on prior law that qualifies under *Landgraf*," and that applying the current law would "further[] Congress's intent to protect information regarding threatened or rare resources of the National Parks." *Id.* In a footnote, the court returned to the concern expressed in the *Landgraf* footnote quoted above. The Ninth Circuit opined that the group's "expectation of success in its litigation is not the kind of settled expectation protected by *Landgraf*'s presumption against retroactivity." *Id.* at 1062 n.1. Were that so, the court concluded, "no statute would ever apply to a pending case unless Congress expressly made it applicable," and "[t]he *Landgraf* inquiry would become pointless." *Id.*

Similarly, in the present case, Southeast filed a request for a benefit that it felt entitled to under the governing law. But an intervening change in the law deprived Southeast of its anticipated benefit by the time that the PSC got around to approving Southeast's request. Just as the FOIA request in *Southwest Center for Biological Diversity* did not constitute the exercise of a vested right because the Center's right to the information that it sought did not attach until the federal court ordered disclosure, Southeast's opt-in request was not the exercise of a vested right because its opt-in application did not mature until the PSC gave its approval. Any belief that Southeast may have had that it would prevail before the PSC "is not the kind of settled expectation protected by . . . [the] presumption against retroactivity." *Id.* As the Ninth Circuit explained, "if that expectation were sufficient then no [new] statute would ever apply to a pending case." *Id.* Finally, just as applying the new FOIA exemption "further[ed]" congressional intent, applying the current all-or-nothing rule honors the FCC's goal of giving the new rule a broad and immediate effect. *See* Second Report and Order, 19 FCC Rcd. at 13501 ¶ 10.

This court's recent decision in *Combs v. Commissioner of Social Security*, No. 04-5275, - - F.3d - - (6th Cir. August 16, 2006) (en banc), which was decided after we heard oral argument, further supports our resolution of the present case. The issue in *Combs* was whether the Social Security Administration (SSA) impermissibly adjudicated plaintiff's application for disability benefits under criteria that changed while her case was pending before the agency. Slip. Op. at 2. Specifically, the SSA eliminated a regulation that mandated a conclusive finding of disability for applicants who qualified as obese under that regulation. *Id.* at 3. The SSA refused to apply the old regulation to Combs's case, even though she had submitted her application almost three years before the old regulation was eliminated.

Although there was no majority opinion in *Combs*, a majority of the en banc court held that refusing to adjudicate Combs's pending application pursuant to the old regulation did not have an impermissible retroactive effect. *See id.* at 6 (plurality opinion) (concluding that the rule change was procedural in nature and that applying the new rule was permissible because "procedural rules regulate secondary as opposed to primary conduct"); *id.* at 13 (Gilman, J., concurring in the judgment) (concluding that the rule change was substantive in nature, but that there was no impermissible retroactive effect because applying the new regime did not impair a vested right or attach new legal consequences to past conduct). The opinion concurring in the judgment, which provided the necessary eighth vote for affirming the judgment of the district court, relied explicitly upon the First Circuit's decision *Pine Tree Medical Associates* in concluding that the claimant "had no settled expectation—let alone a vested right—in the use of the 'substantive regulations in force' when she filed her disability claim." *Id.* at 13 (citing *Pine Tree Medical Assocs.*, 127 F.3d at 122).

We believe that the same result follows in the present case. Indeed, we find Southeast's retroactivity argument even less convincing than that of the plaintiff in *Combs*, another case in which a private party submitted an application to a government agency. Southeast simply did not have a settled expectation, "let alone a vested right," that the pick-and-choose rule would govern its opt-in request pursuant to 47 U.S.C. § 252(i). *See id.* If the elimination of a regulation that had

unquestionably governed Combs's case for almost three years before the SSA did not impair her vested rights, then we fail to see how applying the all-or-nothing rule to Southeast's two-month-old opt-in request would impair a vested right or otherwise upset its settled expectations.

Southeast counters by comparing the present case to the Supreme Court's decision in *INS v. St. Cyr*, 533 U.S. 289 (2000). In *St. Cyr*, a lawful permanent resident (LPR) pled guilty to an aggravated felony, thus making him subject to deportation. At that time, however, the immigration laws contained a discretionary waiver provision that gave him the opportunity to avoid deportation. Intervening federal legislation repealed the waiver provision. The question before the Court was whether denying St. Cyr the ability to seek the discretionary waiver constituted an impermissibly retroactive application of the new law. Answering that question in the affirmative, the Court reasoned that the new legislation converted possible deportation into certain deportation, *id.* at 325, and in doing so "attache[d] a new disability, in respect to transactions or considerations already past." *Id.* at 321. The Court explained that St. Cyr's plea agreement constituted a *quid pro quo* in which he sacrificed constitutional rights for the "perceived benefit" of retaining the opportunity to seek discretionary relief. *Id.* at 321-22.

To start with, a comparison to *St. Cyr* is unpersuasive because the reach of that case has been limited by both this court and the Supreme Court. This court "has limited the application of *St. Cyr* to aliens who pl[ed] guilty to removable offenses prior to the enactment of [the intervening legislation] regardless of when the removable offenses occurred." *Patel v. Gonzales*, 432 F.3d 685, 691 (6th Cir. 2005) (citing *Garcia-Echaverria v. United States*, 376 F.3d 507, 516 (6th Cir. 2004)). Furthermore, the Supreme Court reaffirmed during its most recent term that *St. Cyr* is best read as resting on the LPR's sacrifice of his constitutional rights in reliance on the availability of other forms of relief and on the fact that applying the new legislation would effectively have eliminated the underlying basis for the plea agreement signed by the parties. *See Fernandez-Vargas v. Gonzales*, 548 U.S. ___, 126 S. Ct. 2422, 2431-32 (2006).

In the present case, in contrast, the only action that Southeast took in reliance on the pick-and-choose rule was the filing of the adoption request at issue here. There is no indication in the record that Southeast signed its agreement with BellSouth with the understanding that it would retain indefinitely the opt-in power conferred by the pick-and-choose rule. Indeed, the relevant paragraph in the parties' contract that governs the potential adoption of future agreements tracks the language of the statute, *not* that of the regulation. This is significant because the language of the statute itself, as explained above, does not indicate whether an ILEC's duty to provide the enumerated items is on a service-by-service or an all-or-nothing basis. Moreover, unlike in *St. Cyr*, Southeast did not give up or sacrifice anything in reliance on the FCC rule then in place. Applying the current law to Southeast's application, in other words, would not upset the basis of any *quid pro quo* that Southeast had previously entered into.

Southeast further cites the famous case of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), in support of its vested-rights argument. Most well-known for its discussion of judicial review, the case also addressed whether Marbury was entitled to the relief that he sought and, as part of that inquiry, whether the right that he sought to vindicate was vested. The Supreme Court held that Marbury's right to his commission vested when the President signed it because the only step remaining was the nondiscretionary, ministerial act of having the Secretary of State place a seal on the commission. *Id.* at 158-59.

As BellSouth argues, there is a fundamental distinction between *Marbury* and the present case. Whereas the Secretary of State in *Marbury* had no choice—i.e., no discretion—but to place the seal on a commission that already bore the President's signature, the PSC's consideration of Southeast's adoption request was not purely ministerial. Southeast has not pointed to any section

of the Act that would *require* state commissions to approve as a matter of course all adoption requests submitted pursuant to § 252(i) or the relevant FCC regulation. To the contrary, the four express limitations on the opt-in right obliged state commissions to devise procedures for addressing challenges to adoption requests. The state commissions of course retained "discretion" both in devising these procedures and in adjudicating the merits of the disputes. This is the precise opposite of the nondiscretionary, ministerial act of confirming the validity of a presidential appointment by placing a seal on a document. Southeast's reliance on *Marbury* is therefore misplaced.

### 2.      *Other retroactivity arguments*

Although the vested-rights claim is Southeast's central defense of the judgment below, it also argues that applying the all-or-nothing rule to its request would subject it to new liabilities. *See Landgraf*, 511 U.S. at 280 (noting that applying an intervening law may be impermissibly retroactive if it "increase[s] a party's liability for past conduct"). We are not persuaded. As BellSouth convincingly points out, Southeast is not arguing that application of the all-or-nothing rule itself increases Southeast's liabilities, but that certain actions that Southeast has taken since the PSC's decision could subject Southeast to liability that would not attach if the PSC's decision is upheld. This argument is easily distinguishable from a typical "liability" case like *Landgraf*, where the legal change at issue was the imposition of two wholly new forms of liability—compensatory and punitive damages—for past violations of federal civil rights laws. *See* 511 U.S. at 281-82.

Three other arguments raised in the course of these proceedings—two by the PSC and one by BellSouth—merit brief comment. The first is the policy argument used by the PSC as one justification for refusing to apply the all-or-nothing rule to Southeast's opt-in request. Specifically, the PSC expressed concern that applying the new rule to pending cases would prompt ILECs to "delay proceedings when matters are pending" in order to benefit from changes in the law. This concern, even if well founded, is more than offset by the adverse policy consequences that follow from such a ruling. If filing an adoption request guaranteed consideration of the CLEC's request under the law in effect at the time of applying, then a CLEC could have assured that the pick-and-choose rule would apply to any request that it was then contemplating simply by filing the request prior to the effective date of the new regulation. As a consequence, the life of the pick-and-choose rule would have been extended well into the future, a result directly contrary to the intentions of the FCC. *See* Second Report and Order, 19 FCC Rcd. at 13501 ¶ 10.

The PSC's other argument is that applying the all-or-nothing rule would have been improper because, "[b]ut for BellSouth's objection," Southeast's request would have been approved "when the notice was filed." This argument, however, lacks a factual basis. Southeast filed its request on June 8, 2004, and BellSouth did not lodge its objections until June 22, 2004. Yet the request was not processed in the interim, meaning that BellSouth's objection was obviously not a factor in Southeast's request not being approved "when the notice was filed."

Furthermore, BellSouth's decision to object was not, as the PSC says, "extraordinary" in the legal sense. Although nothing in the record indicates the frequency with which ILECs objected to opt-in requests under the old rule, availing oneself of an express legal right to interpose an objection is hardly something that courts view as "extraordinary." What makes BellSouth's objection different, counsel for the PSC maintained at oral argument, is that it did not fit under any of the grounds for objecting expressly enumerated in the pick-and-choose rule or the FCC's First Report and Order. True enough. But the basis for BellSouth's objection was even more fundamental—that the dispute-resolution provision was not available for adoption under the plain language of the pick-and-choose rule because the provision was not an individual interconnection, network element, or service arrangement. *See* 47 C.F.R. § 51.809(a) (1997). The PSC recognized that BellSouth's argument was a straightforward textual one when it adjudicated the adoption request in September

of 2004. Indeed, although now claiming that BellSouth objected on a ground not permitted by the FCC regulation, the PSC did not dismiss the objection as improper, but instead overruled it *on the merits*.

Finally, the PSC's argument strikes us as overbroad in that it relies on circumstances present virtually any time that the law changes during the course of an adjudicative or decisionmaking process. "But for" some delay by a party or some ruling by a decisionmaker, the process would have concluded before the law changed. As we noted above, the fact that a party would have fared better under prior law, standing alone, does not mean that subjecting that party to the current law is impermissible. We therefore find the PSC's "but for" argument unpersuasive.

Finally, we turn to BellSouth's alternative argument for reversal. BellSouth argued before the district court and this court that Southeast's opt-in request should have been denied even under the plain language of the pick-and-choose rule. Our conclusion that the PSC erred in not applying the all-or-nothing rule, however, obviates the need to address this alternative argument. Accordingly, we express no opinion on the soundness of the district court's analysis regarding BellSouth's objection to the application of the pick-and-choose rule in the case before us.

## III. CONCLUSION

For all of the reasons set forth above, we hold that applying the all-or-nothing rule to Southeast's pending adoption request would not have had an impermissible retroactive effect. We therefore **REVERSE** the judgment of the district court and **REMAND** the case with instructions to vacate the order of the PSC.