# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-1489

_____

Qwest Corporation,                              *
                                                *
              Plaintiff - Appellee,             *
                                                *
       v.                                       *
                                                *
Gregory Scott, Chair, Minnesota                 *
Public Utilities Commission;                    *
Edward A. Garvey, Commissioner,                 *
Minnesota Public Utilities Commission;          *
LeRoy Koppendrayer, Commissioner,               *    Appeal from the United States
Minnesota Public Utilities                      *    District Court for the
Commission; R. Marshall Johnson,                *    District of Minnesota.
Commissioner, Minnesota Public                  *
Utilities Commission; Phyllis Reha,             *
Commissioner, Minnesota Public                  *
Utilities Commission; AT&T                      *
Communications of the Midwest, Inc.,            *
                                                *
              Defendants,                       *
                                                *
WorldCom, Inc.; Time Warner Telecom             *
of Minnesota, LLC,                              *
                                                *
              Defendants - Appellants.          *

_____

Submitted:  March 8, 2004
     Filed:  August 23, 2004

_____

Before WOLLMAN, MORRIS SHEPPARD ARNOLD, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

WorldCom, Inc. and Time Warner Telecom of Minnesota, LLC (collectively "WorldCom") appeal the district court's entry of a permanent injunction barring the Minnesota Public Utilities Commission from requiring appellee Qwest Corporation to provide WorldCom with reports regarding the provision of certain telecommunications services. Because we conclude that the Federal Communications Commission (FCC) has not preempted the authority of the Minnesota Public Utilities Commission in this area, we reverse.

I.

Qwest Corporation is an incumbent provider of local telephone services in Minnesota. Long distance providers, such as WorldCom, rely on local telephone providers, such as Qwest, to connect customers to their long distance networks. One method of connecting local and long distance networks is through a "special access" line, which provides a direct connection from a home or business to a long distance network through a dedicated line, rather than through the switched public telephone network. Special access services generally are used by entities, such as large businesses or public institutions, that engage in a high volume of long distance telephone calling, and also allow for the provision of high-speed Internet connections to homes and businesses.

Because of alleged discrimination and quality problems in the provision of special access services by Qwest (formerly US West, referred to herein as Qwest), AT&T Communications of the Midwest filed a complaint with the Minnesota Public Utilities Commission ("Minnesota Commission") on August 18, 1999. On August

15, 2000, over Qwest's objection, the Minnesota Commission asserted jurisdiction over the regulation of Qwest's performance, and found that an investigation should be opened to determine whether quality standards should be developed for Qwest. *In the Matter of the Complaint of AT&T Communications of the Midwest, Inc. Against US West Communications, Inc. Regarding Access Serv.*, Docket No. P-421/C-99-1183, at 5, 15 (Minn. P.U.C. Aug. 15, 2000). The Minnesota Commission also ordered Qwest to conform to "detailed reporting requirements." *Id*. at 15.

The investigation arising out of the AT&T complaint was consolidated with a separate proceeding, which examined the quality of Qwest's provision of various wholesale services to numerous other telecommunications companies, including WorldCom. Following consolidation, the Minnesota Commission heard WorldCom's proposed measurement plan for special access services. On March 4, 2002, the Minnesota Commission issued an order requiring Qwest to provide reports regarding special access performance data to AT&T and WorldCom, in accordance with WorldCom's suggested requirements. *In the Matter of Qwest Wholesale Serv. Quality Standards*, Docket No. P-421/M-00-849, at 4, 2002 WL 906589 (Minn. P.U.C. March 4, 2002). It did so over Qwest's continued assertion that the Minnesota Commission lacked jurisdiction to require such reports. *Id.* Qwest's petition for reconsideration of this order was denied by the Minnesota Commission. *See In the Matter of Qwest Wholesale Serv. Quality Standards*, Docket No. P-421/M-00-849, at 4, 2002 WL 1554523 (Minn. P.U.C. May 29, 2002).

Qwest brought suit in district court, alleging that the Minnesota Commission lacked jurisdiction to require Qwest to comply with the reporting requirements. The district court found that the FCC has exclusive jurisdiction over lines that the FCC classified as "interstate" through a federal regulatory procedure known as "jurisdictional separations," and that the Minnesota Commission's reporting requirements were preempted with respect to those lines. The district court therefore granted Qwest's motion for a permanent injunction as to those special access lines

-3-

which had been classified as interstate, leaving the Minnesota Commission able to regulate only those lines that had been classified as intrastate through the FCC's jurisdictional separations process.

A district court's grant of a permanent injunction is reviewed for abuse of discretion, *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003), but where, as here, the determinative question is purely legal, our review is more accurately characterized as *de novo*. *See United States v. Blue Bird*, 372 F.3d 989, 991 (8th Cir. 2004).

II.

The Communications Act of 1934 ("the Act"), codified at 47 U.S.C. § 151 *et seq.*, established "a system of dual state and federal regulation over telephone service." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986) ("*Louisiana PSC*").  The FCC has authority to regulate interstate wire and radio communications, 47 U.S.C. § 151, but the Act specifically denies the Commission jurisdiction to regulate intrastate communication services, and leaves that authority with the States.  47 U.S.C. § 152(b); *cf. Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 148-51 (1930).[1]  While it may, at first blush, seem a simple matter to divide communication services between "intrastate" and "interstate" categories, "the realities of technology and economics belie such a clean parceling of responsibility." *Louisiana PSC*, 476 U.S. at 360.

---

[1]The Telecommunications Act of 1996 gave the FCC jurisdiction over some purely "intrastate" matters, *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 380 (1999), and the FCC has concluded that the 1996 Act also gave states authority to regulate certain "interstate" matters. *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report & Order, 11 F.C.C.R. 15,499, ¶ 84 (1996), *vacated in part on other grounds*, *Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997), *rev'd in part*, 525 U.S. 366 (1999).

This clean parceling is not possible, because facilities and equipment used to provide intrastate telecommunications services often are used for interstate telecommunications services as well. Such facilities are "conceivably within the jurisdiction of both state and federal authorities," *id.*, and are described by the FCC as "jurisdictionally mixed" or "mixed use" facilities. *E.g.*, *Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 523, 543 (8th Cir. 1998). The special access lines at issue in this case are in the mixed use category, because they carry both interstate and intrastate traffic.

Recognizing that conflicts may emerge because of this dual regulatory system, the Act "establishes a process designed to resolve what is known as 'jurisdictional separations' matters, by which process it may be determined what portion of an asset is employed to produce or deliver interstate as opposed to intrastate service." *Louisiana PSC*, 476 U.S. at 375 (citing 47 U.S.C. §§ 221(c), 410(c)). The Supreme Court explained that "[b]ecause the separations process literally separates costs such as taxes and operating expenses between interstate and intrastate service, it facilitates the creation or recognition of distinct spheres of regulation." *Id.* The FCC has promulgated regulations entitled "Jurisdictional Separations Procedures." According to the Commission, the procedures "are designed primarily for the allocation of property costs, revenues, expenses, taxes and reserves between state and interstate jurisdictions." 47 C.F.R. § 36.1(b).

In 1989, the FCC revised the jurisdictional separations procedures for "mixed use special access lines," such as the lines at issue in this case, which carry both interstate and intrastate traffic. *See In the Matter of MTS and WATS Mkt. Structure, Amendment of Part 36 of the Commission's Rules and Establishment of a Joint Bd.*, 4 F.C.C.R. 5660, at ¶ 1, 1989 WL 511212 (1989) ("*10% Order*"). The FCC explained that prior to this revision, "the cost of special access lines carrying both state and interstate traffic [was] generally assigned to the interstate jurisdiction." *Id.* at ¶ 2. This allocation was known as the "contamination doctrine;" any interstate traffic was

deemed to "contaminate" the service, even when the facilities involved were physically located intrastate. *See In the Matter of MTS and WATS Mkt. Structure, Amendment of Part 36 of the Commission's Rules and Establishment of a Joint Bd.*, 4 F.C.C.R. 1352, at ¶ 5 n.14, 1989 WL 511865 (1989) ("*10% Recommendation*"). The contamination doctrine was criticized because it deprived state regulators of authority over largely intrastate private line systems that carried only small amounts of interstate traffic to otherwise intrastate lines. *10% Order*, 4 F.C.C.R. 5660, at ¶¶ 5-6.

The Commission therefore adopted a bright-line rule known as the "ten percent rule," under which interstate traffic is deemed *de minimis* when it amounts to ten percent or less of the total traffic on a special access line. Under the ten percent rule, the cost of a mixed use line is directly assigned to the interstate jurisdiction only if the line carries interstate traffic in a proportion greater than ten percent. *Id*. at ¶¶ 2, 6-7; *see also* 47 C.F.R. § 36.154(a)-(b). The FCC concluded that the new rule would "resolve existing concerns in a manner that reasonably recognizes state and federal regulatory interests and fosters administrative simplicity and economic efficiency." *10% Order*, 4 F.C.C.R. 5660, at ¶ 6 (footnote omitted).

The question presented in this case is whether the order issued by the FCC through its jurisdictional separations procedure preempts the Minnesota Commission's authority to regulate the quality of special access services on interstate lines provided by Qwest and other companies. Does the *10% Order* allocate between federal and state jurisdictions *all* regulatory authority over special access lines based on the ten percent traffic threshold, or was the FCC's intent more limited? WorldCom argues that the ten percent rule is only a cost allocation measure, and does not assign to the FCC exclusive regulatory authority over lines classified as "interstate" under the rule. Qwest contends that the district court correctly read the FCC's order more broadly to preempt all state regulation of lines classified as interstate under the ten percent rule.

Federal regulations, like federal statutes, may preempt state law, if the regulations are intended to have preemptive effect, and the agency is acting within the scope of authority delegated to it by Congress. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984); *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153-54 (1982). The FCC has authority to preempt state regulation of telecommunications where it is not possible to separate the interstate and intrastate aspects of a communications service, and where the Commission concludes that federal regulation is necessary to further a valid federal regulatory objective. *See*, *e.g.*, *Illinois Bell Tel. Co. v. FCC*, 883 F.2d 104, 114-15 (D.C. Cir. 1989) ("*Illinois Bell*"); *North Carolina Utils. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir. 1977). There is no dispute in this case that the FCC has the *power* to preempt states from establishing standards and requiring reports relating to special access services. The fighting issue is whether the FCC actually intended to do so when it promulgated the *10% Order*.

Several considerations lead us to conclude that the ten percent rule does not preempt the Minnesota Commission's reporting requirements in this case. In discerning the intent of the FCC, we believe it is important to consider the context in which the FCC issued the *10% Order*, namely, the jurisdictional separations process. As noted, the jurisdictional separations procedures "are designed primarily for the allocation of property costs, revenues, expenses, taxes, and reserves between state and interstate jurisdictions." 47 C.F.R. § 36.1(b). "'Jurisdictional separation' is a procedure that determines what proportion of jointly used plant should be allocated to the interstate and intrastate jurisdictions for ratemaking purposes." *MCI Telecomm. Corp. v. FCC*, 750 F.2d 135, 137 (D.C. Cir. 1984). In 2001, the FCC similarly explained that:

> Jurisdictional separations is the process by which incumbent local exchange carriers (ILECs) *apportion regulated costs between the intrastate and interstate jurisdictions*. Historically, one of the primary

-7-

purposes of the separations process has been to prevent ILECs from recovering the same costs in both the interstate and intrastate jurisdictions. Jurisdictional separations is the third step in a four-step regulatory process that begins with an ILEC's accounting system and *ends with the establishment of rates* for the ILEC's interstate and intrastate regulated services. First, carriers record their costs, including investments and expenses, into various accounts . . . . Second, carriers assign the costs in these accounts to regulated and nonregulated activities . . . . Third, carriers separate the regulated costs between the intrastate and interstate jurisdictions in accordance with the Commission's Part 36 separations rules. Finally, carriers apportion the interstate regulated costs among the interexchange services and rate elements that form the cost basis for their interstate access tariffs.

*In the Matter of Jurisdictional Separations and Referral to the Federal-State Joint Bd.*, 16 F.C.C.R. 11382, at 11384-85 ¶ 3, 2001 WL 540481 (2001) (footnotes omitted) (emphases added). The jurisdictional separations process, therefore, is one part of a larger regulatory process for rate regulation. As we see it, neither the jurisdictional separations process, nor the larger regulatory framework in which it exists, is generally designed to confer exclusive regulatory power.

Consistent with this understanding, the District of Columbia Circuit in *Illinois Bell* recognized that the regulatory accounting treatment of a telecommunications service as interstate or intrastate does not necessarily negate the mixed use character of the service for purposes of regulating other aspects of that service. 883 F.2d at 114. In that case, which involved the marketing of a mixed-use service, the court rejected an argument that assignment to the intrastate jurisdiction of certain *costs* associated with marketing controlled whether the FCC could preempt state regulatory authority over the *manner* in which the services were marketed. *Id.* at 113-14. The court viewed the allocation of costs through a jurisdictional separation proceeding and the regulation of marketing practices by the FCC as independent matters, and we agree with this analysis.

The FCC's orders concerning the ten percent rule are consistent with our view that jurisdictional separations procedures generally are designed to allocate costs and regulatory authority over ratemaking, rather than plenary regulatory authority over a telecommunications service. In its order initiating the proceedings, the FCC explained that it was establishing a pleading cycle to consider "various options for the separations treatment of all special access lines that carry significant amounts of both interstate and intrastate traffic." *In the Matter of MTS and WATS Mkt. Structure, Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Bd.*, 1 F.C.C.R. 1287, at ¶ 19, 1986 WL 291193 (1986). The Commission's discussion of the pleading cycle focused on whether and how to continue the "direct assignment of the costs" of mixed-use special access lines. *Id*. (emphasis added).

The *10% Order* itself is plainly concerned with cost allocation. The Order begins by noting that "[a]t present, *the cost of special access lines* carrying both state and interstate traffic is generally assigned to the interstate jurisdiction," *10% Order*, 4 F.C.C.R. 5660, at ¶ 2 (emphasis added), and ultimately "adopt[s] the Joint Board's recommendations *for the separation of investment* in mixed use special access lines." *Id*. at ¶ 8 (emphasis added). The Joint Board, whose reasoning was adopted by the Commission, likewise framed its recommendation as a matter of cost allocation. It began its discussion by noting that a "variety of options might be used *to separate special access costs*," *10% Recommendation*, 4 F.C.C.R. 1352, at ¶ 22 (emphasis added), and then expressed its final view in similar terms: "Based on a careful review of the record in this proceeding, we conclude that *direct assignment of special access costs* is superior to an allocation-based approach in terms of administrative simplicity and economic efficiency." *Id*. at ¶ 25 (emphasis added). The codification of the *10% Order* likewise refers only to costs, without any mention of other regulatory authority. *See* 47 C.F.R. § 36.154(a)-(b).

Qwest argues that the *10% Order* sweeps more broadly because the Joint Board included a statement in its recommendation that "[t]he separations procedures

perform an important role in defining the separate state and federal regulatory spheres, and thus have a major effect on both jurisdictions." *10% Recommendation*, 4 F.C.C.R. 1352, at ¶ 23. The importance and effect of the separations proceedings are indubitable, but Qwest's quotation of the Joint Board begs the question of what "role" is played by the separations proceedings. The Supreme Court also has spoken of "distinct spheres of regulation" that are recognized by the jurisdictional separations process, but it has done so in connection with questions of cost allocation and rate regulation. *Louisiana PSC*, 476 U.S. at 375 (citing *Smith*, 282 U.S. 133). As the Joint Board explained in recommending the ten percent rule, "[t]he fundamental principles of separations were described by the Supreme Court in [*Smith*], which holds that the separation of telephone company plant is necessary *to proper rate regulation*." *10% Recommendation*, 4 F.C.C.R. 1352, at ¶ 33 (citation omitted) (emphasis added). The FCC's statement concerning "regulatory spheres" is susceptible of a broader interpretation if plucked out of context, but we conclude that when the *10% Order* is read as a whole, the Commission's expressed intent to preempt state regulation does not extend to performance measurements and standards.

Qwest also contends that a notice of proposed rulemaking issued by the FCC in November 2001 demonstrates that the Minnesota Commission does not have jurisdiction to enforce the requirements. *See In the Matter of Performance Measurements and Standards for Interstate Special Access Servs.*, 16 F.C.C.R. 20896, 2001 WL 1461100 (2001) ("*Performance Measurements Notice*"). The notice addresses whether the FCC should develop national performance measures and standards for special access services that would serve a purpose similar to that of the requirements instituted by the Minnesota Commission. In the *Performance Measurements Notice*, the FCC solicited "comment on how, if the Commission were to adopt special access measures and standards [regarding interstate special access services], the state commissions might participate in enforcing these requirements." *Id.* at 20902 ¶ 11. The FCC observed that some state regulatory agencies have reached the conclusion that they may not regulate the provisioning of interstate

special access services, because such services are taken pursuant to a federal tariff, but also noted that "[t]he states have taken various positions," and the Commission did not express its own view on whether state regulation was preempted. *Id.* & n.27. The FCC has not yet acted on this notice, either to establish federal performance measures and standards, or to declare that there shall be no such measures and standards at either the federal or state level.

The FCC's comments in the *Performance Measurements Notice* are notably agnostic for an agency that is said to have preempted state performance standards when it issued the *10% Order*. "[B]ecause agencies normally address problems in a detailed manner and can speak through a variety of means, . . . we can expect that they will make their intentions clear if they intend for their regulations to be exclusive." *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 718 (1985). Reading all of the FCC's pronouncements concerning special access services, including this most recent notice of rulemaking, we do not discern an intent of the Commission as yet to preclude all state regulation of these mixed-use services. Preemption ultimately is a political act in our federal system for which Congress or the Executive should be accountable. The judiciary is not in a position to make this policy judgment, and "pre-emption is not to be lightly presumed." *Calif. Fed. Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987). Given the absence of persuasive evidence of preemptive intent by the FCC, we believe the exercise of judicial restraint is the better course. The FCC certainly has the wherewithal to preempt state regulation in this area if it so desires, and the *Performance Measurements Notice* provides a readily available vehicle.

III.

Qwest argues that the judgment of the district court can be affirmed on the alternative ground that the Minnesota Commission's reporting requirements violate the "filed tariff," or "filed rate," doctrine. The filed tariff doctrine has been defined

as a "common law rule forbidding a regulated entity, usu[ally] a common carrier, to charge a rate other than the one on file with the appropriate federal regulatory authority[.]" *Black's Law Dictionary* 642 (7th ed. 1999). Qwest argues that the Minnesota Commission's reporting requirements violate the filed tariff doctrine, because the requirements alter the services provided under Qwest's federal special access tariff. The district court ruled that the filed tariff doctrine does not apply in this case, because the doctrine addresses the relationship between a carrier and its customers, not the relationship between a carrier and a regulator. We agree with this conclusion of the district court.

The Supreme Court has stated that the heart of the filed tariff doctrine is an anti-discrimination policy designed to protect customers, and that this policy "is violated when similarly situated customers pay different rates for the same services." *AT&T Co. v. Cent. Office Tel. Co.*, 524 U.S. 214, 223 (1998). Similarly, we have stated that "[t]he purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of rates; and (2) insure that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992). We have rejected the argument that the doctrine protects competitors, noting that the rule is "formulated to ensure uniformity of rates as between customers." *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1179 (8th Cir. 1982).

Qwest has not cited any authority holding that the filed tariff doctrine applies to the relationship between a carrier and a regulatory agency. The doctrine is designed to "ensure rate uniformity by confining the authority to oversee the reasonableness of rates to a single regulatory agency," *id.*, and we do not see how rate uniformity is at issue in this case. We agree with the district court's conclusion that this case turns on the issue of preemption, and the actions of the Minnesota Commission do not conflict with the filed tariff doctrine.

\* \* \*

For the foregoing reasons, we reverse the judgment of the district court, and remand for proceedings consistent with this opinion.

_____