# United States Court of Appeals
## For the First Circuit

No. 11-1504

PUERTO RICO TELEPHONE COMPANY, INC.,

Plaintiff, Appellee,

v.

T-MOBILE PUERTO RICO LLC,

Defendant, Appellant,

TELECOMMUNICATIONS REGULATORY BOARD OF PUERTO RICO;
NIXYVETTE SANTINI-HERNANDEZ, in her official capacity as member
of the Telecommunications Regulatory Board of Puerto Rico;
VICENTE AGUIRRE-ITURRINO, in his official capacity as member of
the Telecommunications Regulatory Board of Puerto Rico;
SANDRA TORRES-LOPEZ, in her official capacity as President of the
Telecommunications Regulatory Board of Puerto Rico,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Jaime E. Toro-Monserrate, with whom Toro, Colón, Mullet,
Rivera & Sifre, P.S.C., Christopher W. Savage, and Davis Wright
Tremaine, LLP were on brief, for appellant.
Eduardo R. Guzmán, with whom Drinker Biddle & Reath LLP was on
brief, for appellee.

May 2, 2012

**LYNCH, Chief Judge**. This case arises out of a dispute regarding the applicable billing rate for T-Mobile Puerto Rico LLC's use of certain services provided by Puerto Rico Telephone Company, Inc. (PRTC), an incumbent local exchange carrier (ILEC). It requires us to address several issues under the Telecommunications Act of 1996 (TCA), including what is meant by the term "discrimination."

PRTC and T-Mobile entered into an interconnection agreement (ICA), pursuant to the TCA, in 1999, and into a second agreement in 2001. These agreements provided that certain "intrastate access" services would be billed at a rate contained in PRTC's federal tariff filed with the Federal Communications Commission (FCC). T-Mobile was billed at this rate until 2002, when PRTC announced its view that this billing rate was in error, the disputed services were not covered under the ICA, and the applicable billing rate was a higher rate found in PRTC's local tariff. T-Mobile disagreed. Roughly $2 million is at issue.

T-Mobile filed suit with the Telecommunications Regulatory Board of Puerto Rico (the Board), which ruled in favor of T-Mobile as a matter of Puerto Rico contract law, holding that the FCC tariff rate applied. In response, PRTC filed suit in federal court against T-Mobile and the Board, raising a variety of claims as to why the Board's decision was unlawful.

The district court granted summary judgment for PRTC and entered judgment vacating the Board's order, holding that the Board's decision resulted in the ICA discriminating against third-party carriers, in violation of federal law. P.R. Tel. Co. v. Telecomms. Regulatory Bd. of P.R., No. 08-1885, 2011 WL 1097741, at *9 (D.P.R. Mar. 18, 2011).

We reverse the judgment of the district court, hold that the agreement was neither discriminatory nor violative of any other provision of federal law, and remand with instructions for the district court to reinstate the Board's order and enter judgment in favor of T-Mobile.

I.

Before the enactment of the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, local telephone service was provided largely by local exchange carriers (LECs), which were typically local monopolies. Global NAPs, Inc., v. Verizon New England, Inc., 396 F.3d 16, 18 (1st Cir. 2005). Before the TCA, LECs owned the physical infrastructure necessary to receive and deliver phone calls among customers and new local carriers could not compete with the incumbent without developing their own separate physical network. Talk Am., Inc. v. Mich. Bell Tel. Co., 131 S. Ct. 2254, 2257-58 (2011).

This changed with the enactment of the TCA, which "imposed a number of duties on incumbent providers of local

-4-

telephone service in order to facilitate market entry by competitors." Id. at 2257. These duties include (1) a requirement that ILECs provide "interconnection" with the ILEC's network for "the transmission and routing of telephone exchange service," 47 U.S.C. § 251(c)(2), (2) the duty "to offer for resale at wholesale rates any services that the carrier provides at retail to subscribers that are not telecommunications carriers," id. § 251(c)(4)(A), and (3) most relevant to this case, an "unbundled access" requirement that ILECs provide "nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory," id. § 251(c)(3). Such "unbundled network elements" are typically referred to as "UNEs."

The ICAs under which such services are provided may result from either voluntary negotiations or arbitration. AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 373-74 (1999). If voluntarily negotiated, the agreement may be made "without regard to the standards set forth in subsections (b) and (c) of section 251." 47 U.S.C. § 252(a)(1). Such voluntarily negotiated agreements must be submitted to the relevant state commission for approval or rejection; the state commission may only reject such voluntarily negotiated agreements if it finds that (1) "the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement," or (2)

-5-

"the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity."  <u>Id.</u> § 252(e)(2)(A).

The TCA also contains a provision requiring LECs to "make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." <u>Id.</u> § 252(i).

The TCA does not displace the ability of telecommunications carriers to agree to purchase services from ILECs on a tariffed basis, under provisions of the communications law that pre-date the TCA.  <u>See</u> <u>id.</u> § 251(g) (providing that LECs must provide certain services that they provided under any "regulation, order, or policy of the Commission," before the TCA became effective until such obligations are "explicitly superseded" by FCC regulations); <u>see also</u> <u>In re Unbundled Access to Network Elements</u>, 20 FCC Rcd. 2533, 2557-58 (2005) ("[W]e note that incumbent LECs remain subject to the nondiscrimination provisions of the Act, such as that found in section 202.  Thus, where wireless and long distance carriers seek to use incumbent LEC facilities on a tariffed basis, they will be entitled to access on similar terms as other, similarly situated carriers."); <u>In re Implementation of the Local Competition Provisions in the</u>

<u>Telecommunications Act of 1996</u> (<u>Local Competition Order</u>), 11 FCC Rcd. 15499, 16013 (1996) ("Pursuant to section 251(g), LECs must continue to offer tariffed interstate access services just as they did prior to enactment of the 1996 Act.").

II.

The parties agree that PRTC's challenge to the Board's decision is in the nature of an appeal from an administrative agency, so we recount the facts as they were presented in the administrative record before the Board. The same record was before the district court.

A.      <u>Factual Background</u>

In June 1999, PRTC and T-Mobile[1] entered into a one-year voluntary ICA, pursuant to 47 U.S.C. §§ 251-252. This agreement contained provisions governing the "local interconnection" of the two entities and provided that the parties would designate points of interconnection to each other's networks. The 1999 ICA included an attachment summarizing the rates. At issue in this case is the "intrastate access services" rate, which provided that the rate would be "[a]s per applicable portions of P.R.T.A. Intra-island Switched Access Tariff K-2, Sec. VII." That tariff, in turn,

---

[1] The parties have stipulated that T-Mobile was formerly known as SunCom Wireless Puerto Rico Operating Company, LLC, and is, for purposes of this litigation, a successor to (1) Telecorp Communications, Inc., (2) AT&T Wireless Services, Inc., and (3) AWS Network Newco, LLC. These predecessors are described as T-Mobile in this opinion.

specified that certain rates would be those provided in "Section 17 of PRTC FCC Tariff No. 1."

In 2001, the parties voluntarily agreed on a new ICA, which had an initial term of two years and contained similar provisions regarding local interconnection. The 2001 ICA, like the 1999 ICA, provided that the "Intrastate Access" price would be "[p]er applicable portions of P.R.T.A. Tariff K-2 Section VII." The 2001 agreement was effectively in place until 2008.

A new agreement was entered into effective January 1, 2008. The parties agree that the provisions of the 1999 and 2001 agreements govern for the purposes of the disputed billing at issue here, which took place from 1999 to 2007.

PRTC provided T-Mobile with two services whose pricing is at issue here: (1) high capacity DS-1 and DS-3 circuits that connect T-Mobile's cell sites to T-Mobile's mobile telephone switching office (MTSO) and (2) circuits that connect T-Mobile's MTSO to points of interconnection (POIs) with PRTC.

PRTC's position is that the lower rates under its FCC tariff do not govern.[2] PRTC argues that the governing rate is the intrastate private line rate, as provided in PRTC's local tariff

_____

[2] In fact, there appear to be three lower tariff regimes: (1) interstate switched access prices, as provided in PRTC's FCC Tariff No. 1, § 17; (2) interstate special access prices, also provided in FCC Tariff No. 1, § 17; and (3) intrastate switched access prices, as provided in PRTC's tariff K-2, § 7. The rates appear to be the same under each of the three.

-8-

F-7. The rates are substantially higher under the local tariff F-7. As said, the Board rejected the application of the higher local tariff.

PRTC billed T-Mobile for the disputed services at the lower rates contained in the FCC tariff from 1999 to 2002. However, in December 2002, PRTC informed T-Mobile that these facilities should have been billed in accordance with the local tariff F-7 but, "owing to an omission," had been billed at the FCC Tariff No. 1 rate. Its position was that while T-Mobile could in theory have "purchase[d] interstate offerings for interstate use" and paid the interstate FCC tariff rate, it could have done so only if it complied with the terms and conditions of the FCC tariff, or, alternatively T-Mobile could instead have purchased "intraisland offering for intraisland use," and paid the local tariff rate. PRTC's view was that the FCC tariff would not apply, because T-Mobile had not certified that more than ten percent of the traffic is interstate, as is required under the tariff. As a result, PRTC contended that T-Mobile could only acquire the services under the local tariff F-7.

T-Mobile disagreed, explaining that it believed that the disputed services were governed by the ICA's provision for "intrastate access," which incorporated the rates of the local K-2 tariff and, by extension, the FCC tariff rates, regardless of the ten-percent provision. T-Mobile's position was that it agreed to

purchase the service directly under the ICA, which in turn incorporates the FCC tariff rates, but that it did not agree to compliance with the ten-percent term and condition of that tariff. Until December 2002, T-Mobile had been billed at and had paid the lower rate; thereafter it paid only the amount of its bills that would be proper if the FCC tariff rate applied. PRTC sent T-Mobile numerous letters requesting payment of the outstanding balance based on the local tariff F-7 but continued to provide service.

B.      Procedural History

This billing dispute continued until early 2007, with the parties unable to come to any agreement. In April 2007, PRTC sent T-Mobile a letter requesting payment of the $1,914,650.08 it claimed it was due under the local tariff, and threatened to "terminate the Interconnection Agreement and the services provided under it" on May 22, 2007, if T-Mobile did not comply. On May 18, T-Mobile filed suit with the Board, alleging that PRTC had threatened to discontinue services because of T-Mobile's failure to pay the amounts PRTC claimed were due under the applicable tariff. PRTC carried out its threat, disconnecting certain facilities on May 22. That same day, in response to motions filed by T-Mobile, the Board ordered PRTC to immediately reconnect all lines it had disconnected; PRTC complied with the order.

The parties submitted cross motions for summary judgment to the Board. The crux of PRTC's argument was that T-Mobile was

attempting to gain the benefit of the FCC tariff rate without having to satisfy the requirement under that tariff that more than ten percent of the traffic routed through the facility was interstate traffic. PRTC also argued that the ICA did not cover the disputed services, and as a result only the rates in the FCC tariff or the local tariff could apply. Because the ten-percent requirement was not met, the FCC rate could not apply, and by process of elimination the local tariff rate had to apply. T-Mobile disagreed, arguing that the parties' past actions and the terms of the ICA made clear that it was entitled to the rate specified in the FCC tariff, regardless of whether the ten-percent requirement was met, pursuant to the provisions of the ICA.

On July 2, 2008, the Board decided the matter in favor of T-Mobile. The Board concluded that "PRTC billed [T-Mobile] under the FCC 1 Tariff . . . by which then it can not go against its own acts pretending to modify the charges." The Board examined the billing codes for the bills issued, and found that PRTC billed the facilities under the FCC Tariff No. 1, § 17 as a "Special Access Service." The Board thus found that the ICA obliged PRTC to bill the services at the rate specified in the FCC tariff.

PRTC filed suit against the Board, the Board members, and T-Mobile in federal court on August 8, 2008. PRTC's complaint advanced several theories as to why the Board's decision was unlawful, including: (1) the services purchased by T-Mobile were

not UNEs and thus could not have been acquired by T-Mobile under the ICA, (2) T-Mobile's attempt to gain the benefit of the FCC tariff without complying with all of its conditions violated 47 U.S.C. § 203 and the filed rate doctrine, (3) requiring PRTC to offer the services under the rates in the FCC tariff would impose unreasonable and unjust terms in violation of 47 U.S.C. § 251(c), (4) requiring PRTC to offer the services under the rates in the FCC tariff would be discriminatory in violation of 47 U.S.C. § 251(c), and (5) the Board's decision was arbitrary and capricious.

As relief, PRTC requested that the district court (1) declare the Board's order unlawful, (2) enjoin all defendants from seeking to enforce the Board's order, (3) find that, as a matter of law, the facilities were provided under one of the tariffs, rather than the ICA, and (4) find that T-Mobile did not comply with FCC Tariff No. 1 and thus did not acquire the facilities under that tariff.

On November 12, 2008, T-Mobile moved to dismiss, arguing that because the Board's decision was based entirely on state law, no federal question was raised and the district court lacked jurisdiction. The district court rejected this argument, reasoning that "the resolution of PRTC's claim turns on whether the Board's Resolution and Order is: (1) inconsistent with federal law and FCC regulations; and (2) preempted by the Supremacy Clause," and thus federal jurisdiction existed. P.R. Tel. Co. v. Telecomms.

<u>Regulatory Bd. of P.R.</u>, No. 08-1885, 2010 WL 1133859, at *3 (D.P.R. Mar. 22, 2010).

The parties then submitted cross-motions for summary judgment, after agreeing that this case was "in the nature of an appeal from an administrative agency's decision," and as a result "the Court's review is confined to the administrative record before the Board."

PRTC made several arguments in its motion for summary judgment: (1) that the Board's order conflicted with the filed rate doctrine, which requires entities who file tariffs with the FCC to apply the rates listed therein only if all conditions of the tariff have been complied with; because T-Mobile did not comply with the ten-percent interstate requirement of the FCC tariff, it would be contrary to federal law to allow the rate of that tariff to apply, (2) that the Board's order established discriminatory and unreasonable terms and conditions, in violation of 47 U.S.C. § 251(c), because it would render T-Mobile the only entity during the period of time in dispute entitled to purchase the facilities based on the rates in the FCC tariff without complying with the tariff's requirements, and (3) that the Board incorrectly interpreted the ICA as covering the disputed services.

T-Mobile's motion for summary judgment argued that the Board's decision was neither in conflict with federal law nor arbitrary and capricious, and should be upheld. T-Mobile argued

-13-

that voluntary ICAs were exempt from the requirements of 47 U.S.C. § 251(b) and (c), pursuant to § 252(a)(1), so there was no conflict between the ICA and federal law. T-Mobile then argued that the Board correctly applied Puerto Rico contract law in finding that the ICA governed the disputed facilities at issue, and in finding that the ICA provided that the relevant rate was that specified in the FCC tariff.

The district court granted summary judgment for PRTC and entered judgment vacating the Board's order. P.R. Tel. Co., 2011 WL 1097741, at *9. The court found that because the agreement was voluntarily negotiated, the provision of 47 U.S.C. § 251(c)(2)(D) prohibiting discriminatory ICAs did not apply, because the plain text of 47 U.S.C. § 252(a)(1) allows voluntary agreements to be made "without regard to the standards set forth in subsections (b) and (c) of section 251." See P.R. Tel. Co., 2011 WL 1097741, at *8. However, the court reasoned that there was no such exemption from the nondiscrimination requirement contained in 47 U.S.C. § 252(e)(2), which provides that ICAs must be submitted to the state commission for approval, and the commission "may only reject . . . an agreement . . . if it finds that--(i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement." P.R. Tel. Co., 2011 WL 1097741, at *8. The court found the Board's interpretation of the ICA discriminatory, because it "allows T-Mobile to benefit from the

-14-

rates found in PRTC Tariff FCC No. 1 without having to comply with the terms and conditions set forth in said tariff," which would be discriminatory because "T-Mobile would be the only carrier entitled to receive such benefits." Id. at *9.

T-Mobile moved for reconsideration, which the district court denied. This appeal followed.

III.

The parties have raised four issues in this appeal: (1) whether PRTC has standing to raise a claim that the ICA, as interpreted by the Board, is discriminatory as to other carriers, (2) whether the ICA is discriminatory, (3) whether enforcement of the ICA, as interpreted by the Board, violates the filed rate doctrine, and (4) whether the Board's interpretation of the ICA is arbitrary and capricious.

The standing argument was raised for the first time on appeal. We reject the argument and find that PRTC has standing to raise the discrimination claim. The other three arguments were presented to the district court, which granted summary judgment in favor of PRTC solely on the discrimination theory and did not reach the other two issues. We find that the district court erred in finding the ICA discriminatory.

This leaves the question of whether to remand for the district court to decide the remaining issues in the first instance, or to resolve them on appeal. We reach the issues, as

they have been adequately briefed and present questions of law. We reject PRTC's arguments that the Board's decision violates the filed rate doctrine and is arbitrary and capricious. Finding all of PRTC's challenges to the Board's order to be without merit, we remand to the district court to reinstate the Board's order.

A.      Standing

This standing issue was not raised before the district court. The jurisdictional question of whether the standing requirements of Article III are satisfied may be raised at any time. See Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 467 (1st Cir. 2009). We engage in a de novo analysis of standing. Katz v. Pershing, LLC, 672 F.3d 64, 70 (1st Cir. 2012).

T-Mobile argues that PRTC lacks standing to present the particular argument of discrimination because the only entities harmed by any discrimination would be competing third-party carriers, not PRTC. Without analyzing whether this is in fact a non-waivable Article III argument, we reject T-Mobile's argument.[3]

---

[3]  T-Mobile's standing argument does not appear to be that the court lacks jurisdiction over the entire case or controversy. It is perfectly clear that PRTC has standing to bring suit, as enforcement of the agreement as interpreted by the Board will result in monetary losses to PRTC. T-Mobile's argument, instead, is that PRTC cannot raise one specific theory -- that the agreement is discriminatory -- in an otherwise proper suit. Because we reject T-Mobile's argument on its own terms, we need not address the question of whether this form of standing argument is permissible. See generally DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) (explaining that the Court's "standing cases

It is clear that the three requirements for Article III standing -- injury in fact, redressability, and causation -- are at least facially met.  See Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009); Katz, 672 F.3d at 71-72.  PRTC has alleged a clear injury -- the lower billing rate applied to past transactions -- which would be redressed if the Board's interpretation of the ICA as applying the federal rate to the disputed services were found by the court to be discriminatory and therefore unenforceable.  Moreover, if PRTC were a party to a discriminatory ICA that violated federal law, it could potentially be subject to suits from other carriers or governmental enforcement actions.  T-Mobile offers no argument as to why either of these two injuries are insufficient to confer standing.  The minimum requirements of Article III standing are met here.

B.      Discrimination

We have not articulated a standard of review for determining when an ICA is discriminatory in violation of 47 U.S.C. §§ 251-252.  Because the issue which concerns us is a question of law and not fact, review is de novo.  See Global NAPS, 396 F.3d at 23 ("This circuit has not previously articulated precisely the

---

confirm that a plaintiff must demonstrate standing for each claim he seeks to press"); Pagán v. Calderón, 448 F.3d 16, 27 (1st Cir. 2006) ("The standing inquiry is both plaintiff-specific and claim-specific.  Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts.").

standard of judicial review of state agency determinations under the TCA.  Issues of law, as here, are subject to de novo review, and we apply that standard to state agency determinations under the TCA." (citing P.R. Tel Co. v. Telecomms. Regulatory Bd. of P.R., 189 F.3d 1, 7 (1st Cir. 1999))).

T-Mobile argues that the agreement is not discriminatory due to the existence of 47 U.S.C. § 252(i), which allows other entities to opt-in to an ICA, under certain conditions.[4] We agree. In the circumstances of this case, the effect of § 252(i) means

_____

[4]  T-Mobile never made any argument before the district court that this section was relevant to any assessment of discrimination until the motion for reconsideration.  Nevertheless, we bypass the issue of waiver and reach the § 252(i) argument.  We have articulated a non-exhaustive list of six factors to consider when deciding whether to allow an argument not made before the district court to be raised on appeal:

> (1) whether the litigant's failure to raise the issue has deprived the court of appeals of useful factfinding, or whether the issue was of a purely legal nature; (2) whether the omitted argument raises an issue of constitutional magnitude; (3) whether the argument was highly persuasive and failure to reach it would threaten a miscarriage of justice; (4) whether considering the issue would cause prejudice or inequity to the adverse party; (5) whether the failure to raise the issue was inadvertent and provided no tactical advantage; and (6) whether the issue implicates 'matters of great public moment.'

In re Net-Velázquez, 625 F.3d 34, 41 (1st Cir. 2010) (quoting Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 628 (1st Cir. 1995)).  Here, factors one, three, four, and five are met. Moreover, PRTC makes no claim of waiver on appeal.

that the agreement is not discriminatory, and requires reversal of the district court's decision.[5]

To start, it is not at all clear that there is any nondiscrimination requirement that applies to voluntarily negotiated agreements that have been approved by the relevant state commission. Section 251 does require that interconnection as well as unbundled network elements be provided on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(2)(D), (c)(3). However, voluntarily negotiated ICAs are exempt from this requirement: such agreements may be made "without regard to the standards set forth in subsection (b) and (c) of section 251." Id. § 252(a)(1); see also AT&T Corp., 525 U.S. at 372-73 (stating that under § 252(a)(1), "the incumbent can negotiate an agreement without regard to the duties it would otherwise have under § 251(b) or § 251(c)").

The district court recognized this and based its decision on the nondiscrimination requirement of a separate section, § 252(e). P.R. Tel. Co., 2011 WL 1097741, at *8-9. That subsection provides that the state commission "may" reject agreements that, in whole or in part, "discriminate[] against a

_____

[5] T-Mobile also asserts that PRTC waived its ability to raise any claim of discrimination by failing to raise it before the Board at the time the agreement was negotiated. This argument is raised for the first time on appeal without citation to any pertinent authority, so it is both inadequately presented and waived. See R.I. Hospitality Ass'n v. City of Providence, 667 F.3d 17, 49 n.23 (1st Cir. 2011).

telecommunications carrier not a party to the agreement." 47 U.S.C. § 252(e)(2). Once the state commission has approved an agreement, that provision, by its own terms, does not appear to provide any basis for invalidating an agreement because it is discriminatory.

However, we do not decide this issue, as even assuming a nondiscrimination requirement were present here, § 252(i) precludes a finding of discrimination even under § 252(e) in these circumstances. As explained below, had another carrier sought to connect on the same terms as provided under the ICA at issue here, such connection and terms would have been generally available.[6]

   1.    Section 252(i) and Its Implementing Regulations

Section 252(i) provides: "A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." 47 U.S.C. § 252(i). The FCC first enacted a regulation interpreting this provision in 1996, which was revised in 2004, after litigation. See Bellsouth Telecomms., Inc. v. Se. Tel., Inc., 462 F.3d 650, 653-55 (6th Cir. 2006) (explaining the history of the FCC's implementation of § 252(i)).

_____

   [6] The record does not show any such carriers in fact sought such agreements.

In 1996, the FCC's first order implementing the TCA explained:

> We conclude that incumbent LECs must permit third parties to obtain access under section 252(i) to any individual interconnection, service, or network element arrangement on the same terms and conditions as those contained in any agreement approved under section 252. . . . In practical terms, this means that a carrier may obtain access to individual elements such as unbundled loops at the same rates, terms, and conditions as contained in any approved agreement.

Local Competition Order, 11 FCC Rcd. at 16139. In essence, this "pick-and-choose" rule[7] provided that carriers could choose individual network elements from a competitor's agreement to be provided to them under 252(i), rather than having to adopt the

_____

[7] As codified, the FCC regulations provided:

> An incumbent LEC shall make available without unreasonable delay to any requesting telecommunications carrier any individual interconnection, service, or network element arrangement contained in any agreement to which it is a party that is approved by a state commission pursuant to section 252 of the Act, upon the same rates, terms, and conditions as those provided in the agreement. An incumbent LEC may not limit the availability of any individual interconnection, service, or network element only to those requesting carriers serving a comparable class of subscribers or providing the same service (i.e., local, access, or interexchange) as the original party to the agreement.

47 C.F.R. § 51.809(a) (1997).

agreement in full.  The Supreme Court upheld this rule in 1999.  AT&T Corp., 525 U.S. at 395-96.

The rule had four exceptions -- ILECs need not provide such services if the ILEC could prove to the state commission that (1) "[t]he costs of providing a particular interconnection, service, or element to the requesting telecommunications carrier are greater than the costs of providing it to the telecommunications carrier that originally negotiated the agreement, or" (2) "[t]he provision of a particular interconnection, service, or element to the requesting carrier is not technically feasible."  47 C.F.R. § 51.809(b) (1997).  Third, other carriers could only opt-in to the agreement "for a reasonable period of time after the approved agreement is available for public inspection."  Id. § 51.809(c).  Fourth, the FCC also explained that "ILECs could 'require a third party [to] agree to certain terms and conditions' beyond the requested service so long as the ILEC proved 'to the state commission that the terms and conditions were legitimately related to the purchase of the individual element being sought.'"  Bellsouth Telecomms., 462 F.3d at 654 (alteration in original) (quoting Local Competition Order, 11 FCC Rcd. at 16139).

In 2004, the FCC adopted a new "all-or-nothing" rule, currently in effect, under which a carrier would have to adopt the

agreement in its entirety, rather than being able to adopt portions of an agreement:

> An incumbent LEC shall make available without unreasonable delay to any requesting telecommunications carrier any <u>agreement in its entirety</u> to which the incumbent LEC is a party that is approved by a state commission pursuant to section 252 of the Act, upon the same rates, terms, and conditions as those provided in the agreement. An incumbent LEC may not limit the availability of any agreement only to those requesting carriers serving a comparable class of subscribers or providing the same service (<u>i.e.</u>, local, access, or interexchange) as the original party to the agreement.

47 C.F.R. § 51.809(a) (emphasis added). This revised provision contains the first three exceptions outlined above. <u>Id.</u> § 51.809(b)-(c).

The FCC intended that this provision apply retroactively to ICAs in force at the time the new rule was promulgated.[8] No challenge to § 252(i) or its implementing regulation is raised here.

One of the few decisions addressing the scope of § 252(i) is our decision in <u>Global NAPS</u>, 396 F.3d 16. There, we held that § 252(i) does not confer an "unconditional right" on a competing

---

[8] At least one circuit has upheld this determination against retroactivity challenges. <u>Bellsouth Telecomms., Inc.</u> v. <u>Se. Tel., Inc.</u>, 462 F.3d 650, 654, 666 (6th Cir. 2006). Another circuit has held that it was within the statutory authority of the FCC to change course, and that the FCC did not abuse its discretion in doing so. <u>New Edge Network, Inc.</u> v. <u>FCC</u>, 461 F.3d 1105, 1112-14 (9th Cir. 2006).

carrier to opt-in to the terms of a previous ICA, in the sense that a competing carrier which had gone through binding arbitration under § 252(b) could not, after a valid arbitration order was issued, escape from that order by opting in to an agreement under § 252(i). Global NAPS, 396 F.3d at 23, 26. We also noted that the FCC had interpreted the opt-in provision as meaning that a requesting carrier could "avail itself of more advantageous terms and conditions subsequently negotiated by any other carrier for the same individual interconnection, service, or element once the subsequent agreement is filed with, and approved by, the state commission." Id. at 27-28 (quoting Local Competition Order, 11 FCC Rcd. at 16139-40) (internal quotation marks omitted).

2.      Interplay Between § 252(i) and Discrimination

On its face, § 252(i) operates to prevent discrimination in ICAs in usual circumstances. If one company adopted an ICA, any other company which felt it was discriminated against could opt-in and gain the benefits of the terms of that agreement, negating any discrimination against that other company.

The FCC has emphasized the importance of that provision to ensuring nondiscrimination under the TCA. In initially enacting the pick-and-choose rule, the FCC explained that "the primary purpose of section 252(i) [is] preventing discrimination." Local Competition Order, 11 FCC Rcd. at 16139.

In switching to the all-or-nothing rule, the FCC reiterated the important role § 252(i) plays in protecting against discrimination:

> We conclude that under an all-or-nothing rule, requesting carriers will be protected from discrimination, as intended by section 252(i). Specifically, an incumbent LEC will not be able to reach a discriminatory agreement for interconnection, services, or network elements with a particular carrier without making that agreement in its entirety available to other requesting carriers. If the agreement includes terms that materially benefit the preferred carrier, other requesting carriers will likely have an incentive to adopt that agreement to gain the benefit of the incumbent LEC's discriminatory bargain. Because these agreements will be available on the same terms and conditions to requesting carriers, the all-or-nothing rule should effectively deter incumbent LECs from engaging in such discrimination.

In re Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 19 FCC Rcd. 13494, 13505 (2004).

The FCC has also explained that requesting carriers are able to enforce their rights under § 252(i):

> Because of the importance of section 252(i) in preventing discrimination, however, we conclude that carriers seeking remedies for alleged violations of section 252(i) shall be permitted to obtain expedited relief at the Commission, including the resolution of complaints under section 208 of the Communications Act, in addition to their state remedies.

Local Competition Order, 11 FCC Rcd. at 16141.

In support of its claim that the ICA here nonetheless was discriminatory, PRTC makes two arguments. First, PRTC claims that the right to opt-in is not unconditional or automatic, as the FCC regulations contain certain restrictions on the ability of carriers to opt-in to agreements. PRTC cites to the first three exceptions to a carrier's ability to opt-in, discussed above, as instances when opting-in may not take place.

None of these exceptions constitutes a sufficient limitation on carriers' opt-in abilities to undermine § 252(i)'s ability to prevent discrimination, in the circumstances of this case. As to the exceptions for cost and technical feasibility, the burden is on the ILEC to prove the exceptions apply. 47 C.F.R. § 51.809(b). More importantly, if it is indeed more costly or not technically feasible to provide such services, it is difficult to see how not providing them (or providing them at a more expensive rate) would be "discriminatory" within the meaning of the statute. The FCC makes this point, explaining that § 252(d)(1) requires carriers to base interconnection and network element charges on costs, and as a result "[w]here costs differ, rate differences that accurately reflect those differences are not discriminatory. This is consistent with the economic definition of price discrimination . . . ." Local Competition Order, 11 FCC Rcd. at 15928; see also id. at 16140 ("We find that section 252(i) permits differential treatment based on the LEC's cost of serving a carrier."). The FCC

has concluded that "[s]trict application of the term 'nondiscriminatory' as urged by those commenters who argue that prices must be uniform would itself be discriminatory according to the economic definition of price discrimination," which includes as discriminatory those situations where prices for different customers are the same even though the costs of supplying those customers are different. Id. at 15928.

As to the limitation that carriers may only opt-in "for a reasonable period of time" after the approved agreement is made available for public inspection, 47 C.F.R. § 51.809(c), PRTC develops no argument as to why this renders the opt-in provision unable to prevent discrimination, and we see none. Moreover, this provision only "limits the amount of time during which negotiated agreements are open to requests under this section," AT&T Corp., 525 U.S. at 396, not the amount of time an agreement timely opted into may remain in force. The FCC has explained this approach: "pricing and network configuration choices are likely to change over time. . . . Given this reality, it would not make sense to permit a subsequent carrier to impose an agreement or term upon an incumbent LEC if the technical requirements of implementing that agreement or term have changed." Local Competition Order, 11 FCC Rcd. at 16140.

PRTC's final argument that § 252(i) is unable to effectively prevent discrimination is that "not every carrier that

-27-

purchases facilities like the Disputed Facilities is eligible to opt into an existing interconnection agreement."  As an example, PRTC claims that interexchange carriers which originate or terminate interexchange traffic are not entitled to such interconnection.

This argument is misplaced.  PRTC's argument is based on the substantive rules defining the scope of the interconnection obligations under § 251(c)(2)-(3), which are based on the language of the statute, not on interpretations of the scope of entities which can opt-in to agreements under § 252(i).  The question of the substantive obligations created under the TCA vis-à-vis different types of carriers is a separate, and antecedent, question from whether there is a limitation on the scope of the opt-in ability under § 252(i).  To the extent that the requirements under the TCA differ for different carriers under § 251(c), that precludes any charge of discrimination.  The TCA itself (or a reasonable FCC interpretation of the TCA) provides that obligations only extend to certain types of carriers.

Indeed, the regulations implementing § 252(i) make clear that "[a]n incumbent LEC may not limit the availability of any agreement only to those requesting carriers serving a comparable class of subscribers or providing the same service (i.e., local, access, or interexchange) as the original party to the agreement." 47 C.F.R. § 51.809(a).  This makes clear that any distinction

between the types of carriers is based on the substantive interconnection obligation, not on the scope of the opt-in provision.

As a result, we hold that in the circumstances of this case, § 252(i) and its implementing regulations preclude any finding that the ICA is discriminatory. There may be other circumstances where § 252(i) is insufficient to protect against certain forms of discrimination, but PRTC has not explained what they are or demonstrated that those conditions are present here. As a result, the district court erred in concluding that the agreement was discriminatory.

We turn next to the remaining arguments.

C.        The Filed Rate Doctrine

PRTC argues that the Board's decision violates the filed rate doctrine, which provides that, when tariffs are filed by a common carrier under the Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 (codified at 47 U.S.C. § 151 et seq.), the services offered in those tariffs may only be provided (1) upon the terms and conditions provided in the tariff and (2) if the rates of the tariff are charged as stated in the tariff. See AT&T Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 221-24 (1998); see also 47 U.S.C. § 203(a) (tariffs must specify "charges" and "the classifications, practices, and regulations affecting such charges").

PRTC makes a two-part argument.  First, PRTC claims that the disputed services it provided were not required to be provided under the TCA, because they were not encompassed within either (1) the obligation under the TCA for PRTC to provide interconnection under § 251(c)(2), or (2) its duty to provide access to UNEs under § 251(c)(3).  Second, PRTC argues that because such services were not required to be provided under the TCA, they could only be provided under the tariffs as filed with the FCC, given the filed rate doctrine.  Because the Board's interpretation of the ICA allows the rate of the federal tariff to apply regardless of whether T-Mobile certified that at least ten percent of the traffic is interstate in nature (which is required by the terms of the federal tariff), PRTC contends that the filed rate doctrine is violated.

We reject the second part of the argument and so do not comment on the first.  PRTC's argument relies on T-Mobile failing to certify it has met the ten-percent threshold.  However, if the ten-percent threshold is not met, the facilities are not "interstate" in nature, as we explain below, and so there could be no conflict with a federal tariff and no violation of the filed rate doctrine.  Such non-interstate facilities are subject to state, not federal, jurisdiction for purposes of rate regulation under the relevant law.

The 1934 Act establishes "a system of dual state and federal regulation over telephone service." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 360 (1986). Section 203, on which PRTC relies, applies to "all interstate and foreign communication by wire or radio." 47 U.S.C. § 152(a) (emphasis added). The Act "grants to the FCC the authority to regulate 'interstate and foreign commerce in wire and radio communications.'" Louisiana, 476 U.S. at 360 (quoting 47 U.S.C. § 151). With certain exceptions not relevant here, nothing in the Act "shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier." 47 U.S.C. § 152(b) (emphasis added). This provision contains "express jurisdictional limitations on FCC power."[9] Louisiana, 476 U.S. at 370.

The determination of whether any particular service or facility is "interstate" or "intrastate" is not always a straightforward matter; any particular facility or service often provides some combination of the two. See id. at 360 ("[T]he realties of technology and economics belie such a clean parceling

---

[9] The TCA contains provisions granting the FCC authority to regulate certain intrastate matters. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 380 (1999) ("[T]he 1996 amendments . . . clearly 'apply' to intrastate service, and clearly confer 'Commission jurisdiction' over some matters."). Neither party argues that such jurisdiction is relevant to the filed rate argument presented here.

of responsibility. This is so because virtually all telephone plant that is used to provide intrastate service is also used to provide interstate service, and is thus conceivably within the jurisdiction of both state and federal authorities.").

Addressing this issue, the Act "establishes a process designed to resolve what is known as 'jurisdictional separations' matters, by which process it may be determined what portion of an asset is employed to produce or deliver interstate as opposed to intrastate service." Id. at 375 (quoting 47 U.S.C. §§ 221(c), 410(c)). The Act creates a "Federal-State Joint Board," and provides that "[t]he Commission shall refer any proceeding regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations . . . to a Federal-State Joint Board." 47 U.S.C. § 410(c). This board is charged with "prepar[ing] a recommended decision for prompt review and action by the Commission." Id.

In 1989, the FCC approved an order of the Joint Board dealing with the jurisdictional treatment of "mixed use special access lines." In re MTS and WATS Market Structure (1989 Order), 4 FCC Rcd. 5660, 5660 (1989). The Joint Board proposed that state interests would be best served by allowing states, rather than the FCC, to "regulate charges" for such lines that contain "small amounts" of interstate traffic. Id. The Joint Board, for administrability purposes, proposed that interstate traffic be

deemed within the jurisdiction of the states, not the FCC, "when it amounts to ten percent or less of the total traffic on a special access line." Id. The FCC agreed. Id. This rule remains in effect today. 47 C.F.R. § 36.154(a) ("State Private Lines" include "all private lines . . . carrying both state and interstate traffic if the interstate traffic on the line involved constitutes ten percent or less of the total traffic on the line," while "Interstate private lines" include private lines that exceed the ten-percent threshold for interstate traffic). This ten-percent threshold is what is specified in PRTC's FCC Tariff No. 1, which is entitled "special access."[10]

As a result, even assuming that the ten-percent threshold is not met, the question of what rates apply to the services provided is not governed by the federal tariff, nor is the filed rate doctrine implicated, because the services provided have been classified as intrastate in nature. Federal law does not prevent the parties to an ICA from agreeing to provide a service with reference to the rate provided in the federal tariff where the special access service is intrastate in nature. The 1989 Order

_____

[10] PRTC's argument rests upon the premise that "[t]he rules that apply to the provisioning and offering of the Disputed Facilities are those of the federal tariff regime that govern special access facilities." We assume that this premise is true for purposes of this argument, as the argument fails even assuming that this is the case. We do not reach the question of whether the disputed services were required to be provided as UNEs or under the interconnection obligation of the TCA.

explains that states are permitted to "regulate charges for intrastate private line systems carrying small amounts of interstate traffic." 1989 Order, 4 FCC Rcd. at 5660. This regulation by the states includes the question of what rates apply. See id. ("[T]he Joint Board stated that intrastate assignment (and consequently intrastate tariffing) of special access lines carrying de minimis amounts of interstate tariff was appropriate and sufficient to address existing problems." (emphasis added)). Indeed, the Joint Board's order mentioned concerns about "tariff shopping" and designed the ten-percent rule to help make clear whether federal or state tariffs governed any particular situation. See In re MTS and WATS Market Structure, 4 FCC Rcd. 1352, 1355-56 (1989) ("Our concern with achieving a proper balance between federal and state interests also leads us to conclude that the opportunities for 'tariff shopping' inherent in the current procedures should be reduced.").

PRTC's filed rate argument depends on the assumption that less than ten percent of the traffic of the disputed facilities was interstate. That being so, there could be no conflict with the filed rate doctrine under federal law, as such facilities were subject to state regulation by the Board.[11]

---

[11] We do not hold that simply because a facility falls below the ten-percent threshold, the FCC has surrendered all jurisdiction to regulate the facility by virtue of the ten-percent rule. In Qwest Corp. v. Scott, 380 F.3d 367 (8th Cir. 2004), the Eighth Circuit addressed this question. It held that the ten-percent rule

D.        Whether the Board's Decision is Arbitrary or Capricious

PRTC's final argument is that the Board's state-law contractual determination was arbitrary or capricious and must be reversed.  This claim fails.

We review the Board's "findings of facts and applications of the law in resolving disputes over the terms of an agreement" under the "arbitrary and capricious standard."  Centennial P.R. License Corp. v. Telecomms. Regulatory Bd. of P.R., 634 F.3d 17, 26 (1st Cir. 2011).  "Under this standard, 'an agency's decision will be upheld unless the agency lacks a rational basis for making the determination or if the decision was not based on consideration of the relevant factors.'"  P.R. Tel. Co. v. Telecomms. Regulatory Bd. of P.R., 665 F.3d 309, 319 (1st Cir. 2011) (quoting Centennial P.R. License, 634 F.3d at 37) (citation and internal quotation marks omitted).  Review under this standard is "narrow," and "if the agency's decision is supported by a rational basis, we will affirm."  Id. (quoting River St. Donuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009)).

---

was not "designed to confer exclusive regulatory power," but instead the jurisdictional separation process is directed toward "rate regulation," allocation of costs and expenses, and other related matters.  Id. at 372.  We do not reach this issue.  The filed rate doctrine, as its name suggests, is a matter of "rate regulation."  See id. at 375 (explaining that a "purpose of the filed rate doctrine is to . . . preserve the regulating agency's authority to determine the reasonableness of rates" (quoting H.J. Inc. v. Nw. Bell Tel. Co., 954 F.2d 485, 488 (8th Cir. 1992)) (internal quotation marks omitted)).

The Board's decision was not arbitrary or capricious, but is entirely rational based on the evidence before it, including PRTC's volte face on what the ICA meant. The Board has considerable expertise in the field of interpreting and assessing ICAs, and considered the relevant billing records, correspondence between the parties, two expert reports, and deposition testimony.

PRTC's argument that the Board's decision was arbitrary or capricious largely relies on PRTC's claim that the Board's interpretation would result in a violation of federal law under the filed rate doctrine, an argument which we have rejected. The remaining portion of PRTC's argument is that the contract is ambiguous and should be interpreted in favor of PRTC. The Board's rejection of the argument is neither arbitrary nor capricious.

IV.

The judgment of the district court is reversed. We remand the case with instructions for the district court to enter judgment in favor of T-Mobile and affirm the Board's order.